UNITED STATES COURT OF INTERNATIONAL TRADE
HON. GARY S. KATZMANN, JUDGE

------------------------------------------------------------------------x
UNITED STATES                            :
                                        :
                     Plaintiff,         :     Court No. 22-00205
                                          :
                v.                          :
                                        :
WANXIANG AMERICA CORPORATION,     :
                                        :
                    Defendant.      :
------------------------------------------------------------------------x

**MEMORANDUM OF LAW
IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS**


                            ROLL & HARRIS LLP
                            Attorneys for Plaintiff


By:       _____

                            Michael E. Roll
                            1999 Avenue of the Stars
                            Suite 1100
                            Los Angeles, CA 90067
                            Tel: (310) 294-9501


                            _____

                            Brett Ian Harris
                            2001 L Street NW
                            Suite 500
                            Washington, DC  20006
                            Tel: (845) 255-1850


Dated: October 12, 2022

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ....................................................................................... 1

FACTS ........................................................................................................ 5

    I.       WXA AND WANXIANG GROUP CORPORATION .............................. 5

    II.      WHEEL HUB ASSEMBLIES IMPORTED BY WXA ............................ 5

          A.     Background ................................................................................ 5

          B.     The Antidumping Duty Order Applicable To Tapered
                 Roller Bearings From China ..................................................... 6

          C.     Scope Issues Relating To WHAs ............................................... 7

    II.      OTHER ARTICLES IMPORTED BY WXA ......................................... 12

    III.    U.S. CUSTOMS AUDIT AND PENALTY CLAIM ............................. 13

LEGAL BACKGROUND ........................................................................ 14

    I.       JURISDICTION AND STANDARD OF REVIEW ............................... 14

    II.      CUSTOMS ENTRY REQUIREMENTS ............................................. 15

    III.    CUSTOMS PENALTY CLAIMS UNDER 19 USC §1592 .................... 17

ARGUMENT ............................................................................................ 20

    I.       THE COMPLAINT FAILS TO STATE A CLAIM THAT WXA
            NEGLIGENTLY VIOLATED 19 USC §1592 WITH RESPECT
            TO ITS ENTRIES OF WHAs .............................................................. 20

          A.     Information derived solely from the public record conclusively
                 demonstrates that WHAs were *not* within the scope of the TRB
                 Order, and Commerce did not advise WXA or the public that it
                 had reached a contrary conclusion, until December 2011 ............. 21

          B.     There was no legal duty to file wheel hub assembly entries
                 with identification of an antidumping duty case number and
                 with deposit of antidumping duties prior to December 2011 ........ 25

          C.     WXA cannot be deemed negligent for filing entries without
                 identification of an antidumping duty case number and without
                 deposit of antidumping duties when the legal requirement to
                 do so did not clearly exist ........................................................ 32

    II.      THE COMPLAINT FAILS TO STATE A CLAIM THAT WXA
            VIOLATED 19 USC §1592 WITH RESPECT TO ITS TARIFF
            CLASSIFICATION OF AUTOMOTIVE PARTS AND
            ACCESSORIES .............................................................................. 39

A.    The Government's complaint does not allege a single misstatement of fact by WXA with regard to the tariff classification of its merchandise, and therefore the complaint does not state a claim for relief under 19 USC §1592 .................40

B.    Universal joints, crosses, yokes and other parts of universal joints are, in fact, correctly classified as parts of motor vehicles within HTSUS heading 8708, and thus there is no legal basis for the misclassification claims with respect to this merchandise..................................................................45

C.    WXA did not act with either gross negligence or negligence with regard to the tariff classification of the merchandise in this case .......................................................................................49

    1.    The Notice of Action issued by Customs concerning the tariff classification of parts of universal joints did not require WXA to enter these articles under HTSUS subheading 8483.90.80.........................................49

    2.    The facts alleged in the complaint cannot support a claim of gross negligence under 19 USC §1592.............51

    3.    The facts alleged in the complaint cannot support a claim of negligence under 19 USC §1592 where, as here, there is a reasonable basis for the classification chosen at the time of entry .................................................52

CONCLUSION.................................................................................55

CERTIFICATE OF COMPLIANCE ...............................................57

## **TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*Allen v. WestPoint-Pepperell, Inc.,*
    945 F.2d 40 (2d Cir. 1991).................................................................15

*Amcor Flexibles Kreuzlingen AG v. United States,*
    560 F. Supp. 3d 1326 (Ct. Int'l Trade 2022) .......................................41

*AMS Assocs. v. United States,*
    881 F. Supp. 2d 1374 (Ct. Int'l Trade 2012), *aff'd,* 737 F.3d 1338
    (Fed. Cir. 2013).......................................................................26, 27, 30

*Barter Sys., Inc. v. Commissioner,*
    Docket No. 4848-87, 1990 Tax Ct. Memo LEXIS 125
    (T.C. Mar. 12, 1990) .......................................................................33, 34

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................14, 15, 42

*Biomet Inc. v. Finnegan Henderson LLP,*
    967 A.2d 662 (D.C. Circuit 2009) ..................................................34, 35

*Bixby v. Commissioner,*
    58 T.C. 757 (1972).............................................................................33

*Briscoe v. LaHue,*
    663 F.2d 713 (7th Circuit 1981), *aff'd on other grounds,*
    460 U.S. 325 (1983)...........................................................................42

*CamelBak Prods., LLC v. United States,*
    649 F.3d 1361 (Fed. Cir. 2011)....................................................45, 46

*Carl Zeiss, Inc. v. United States,*
    195 F.3d 1375 (Fed. Cir. 1999)....................................................39, 40

*Conley v. Gibson,*
    355 U.S. 41 (1957)............................................................................15

*Consolidated Railroad v. Gottshall,*
    512 U.S. 532 (1994)..........................................................................19

*Constant v. Advanced Micro-Devices, Inc.,*
    848 F.2d 1560 (Fed. Cir. 1988), *cert. denied,* 488 U.S. 892 (1988).....................15

*Cont'l Auto. Sys. v. United States,*
    2022 Ct. Intl. Trade LEXIS 94 (Slip Op. 2022-94) (Aug. 12, 2022)...................41

*Cummins Incorporated v. United States,*
    454 F.3d 1361 (Fed. Cir. 2006)...........................................................39

*Debnam v. FedEx Home Delivery,*
No. 10-11025-GAO, 2011 U.S. Dist. LEXIS 35417
(D. Mass. Mar. 31, 2011) ..................................................43

*Dillin v. Commissioner,*
56 T.C. 228, 248 (1971) ....................................................34

*Everson v. United States,*
108 F.3d 234 (9th Cir. 1997) .............................................34

*Fabrene, Inc. v. United States,*
17 Ct. Int'l Trade 911 (1993) .......................................15, 42

*Faus Group, Inc. v. United States,*
581 F.3d 1369 (Fed. Cir. 2009).........................................46

*Franklin v. United States,*
289 F.3d 753 (Fed. Cir. 2002)...........................................39

*Huffman v. Union Pacific R.R.,*
675 F.3d 412 (5th Cir. 2012) ............................................19

*In re Disciplinary Proceeding Against Huddleston,*
137 Wash. 2d 560 (1999)..................................................43

*Kolaski v. United States,*
362 F.2d 847 (5th Cir. 1966) ............................................43

*Lemery v. Commissioner,*
54 T.C. 480 (1970)............................................................34

*McAlister v. Commissioner,*
T.C. Memo. 1989-177.......................................................33

*Magid Glove & Safety Mfg. Co. LLC v. United States,*
567 F. Supp. 3d 1334 (Ct. Int'l Trade 2022) .......................41

*Mitsubishi Elecs. Am. v. United States,*
882 F. Supp. 171 (Ct. Int'l Trade 1995) ........................47, 48

*Neder v. United States,*
527 U.S. 1 (1999).............................................................18

*Orlando Food Corp. v. United States,*
140 F.3d 1437 (Fed. Cir. 1998).................................45, 46, 48

*Palsgraf v. Long Island Railroad Co.,*
248 N.Y. 339, 162 N.E. 99 (N.Y. 1928)..............................51

*Papasan v. Allain,*
478 U.S. 265 (1986).........................................................42

*Pentax Corp. v. Robison,*
125 F.3d 1457 (Fed.Cir. 1997)..........................................18

*Power Train Components, Inc. v. United States*,
911 F. Supp. 2d 1338 (Ct. Int'l Trade 2013) .......................................................12

*Power Train Components, Inc. v. United States*,
2014 U.S. App. LEXIS 9179 (Fed. Cir., May 13, 2014)
*(affirmed without opinion)* .......................................................12, 32, 38

*Quiedan Co. v. United States*,
927 F.3d 1328 (Fed. Cir. 2019)..........................................................36

*Rollerblade, Inc. v. United States*,
112 F.3d 481 (Fed. Cir. 1997)..........................................................40

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007)..........................................................37

*Standard Oil Co. of N.J. v. United States*,
221 U.S. 1 (1911)..........................................................19

*Sunpreme Inc. v. United States*,
946 F. 3d 1300 (Fed. Cir. 2020) *(en banc)* ....................................26, 30

*Tai-Ao Aluminum (Taishan) Co. v. United States*,
983 F.3d 487 (Fed. Cir. 2020)..........................................................28, 29, 30

*Totes-Isotoner Corp. v. United States*,
569 F. Supp. 2d 1315 (Ct. Int'l Trade 2008) .......................................................15

*Trans Tex. Tire, LLC v. United States*,
519 F. Supp. 3d 1289 (Ct. Int'l Trade 2021) ..................................29, 30

*Tufariello v. Long Island R. Co.*,
458 F.3d 80 (2d Cir. 2006)..........................................................19

*United Steel & Fasteners, Inc. v. United States*,
203 F. Supp. 3d 1235 (Ct. Int'l Trade 2017), *aff'd*, 947 F.3d 794
(Fed. Cir. 2020)..........................................................27, 28, 29, 30

*United States v. Blum*,
858 F.2d 1566 (Fed.Cir. 1988)..........................................................18

*United States v. Debrow*,
346 U.S. 374 (1953)..........................................................43

*United States v. Endo*,
635 F.2d 321 (4th Cir. 1980) ..........................................................43

*United States v. Ford Motor Co.*,
463 F.3d 1286 (Fed. Cir. 2006)..........................................................51

*United States v. Green Planet, Inc.*,
494 F. Supp. 3d 1356 (Ct. Int'l Trade 2021) .......................................................17

*United States v. Nitek Elecs., Inc.*,
   844 F. Supp. 2d 1298 (Ct. Int'l Trade 2012), *aff'd by United States v. Nitek Elecs., Inc.*, 806 F.3d 1376 (Fed. Cir. 2015) .................................................18

*United States v. Optrex Am., Inc.*,
   30 Ct. Int'l Trade 650 (2006) ...................................................................33

*United States v. Slutzky*,
   79 F.2d 504 (3rd Cir. 1935) .....................................................................43

*United States v. Thirty-One Boxes*,
   Case No. 16,465a, 28 F.Cas. 56 (S.D.N.Y. 1833) .........................................53, 54

*Universal Electronics., Inc. v. United States*,
   112 F.3d 488 (Fed. Cir. 1997).................................................................40

*Wanxiang America Corporation v. United States*,
   399 F. Supp. 3d 1323 (Ct. Int'l Trade 2019), *aff'd* 12 F. 4th 1369 (Fed. Cir. 2021)....................................................................................7

*Wanxiang America Corp. v. United States*,
   Court # 18-120 ....................................................................................13

*Wiggins v. Commissioner*,
   92 T.C. 869 (1989)................................................................35, 36, 37

*Williams v. United States*,
   239 F.2d 748 (5th Cir. 1957) ..................................................................43

*Wofford v. Commissioner*,
   5 T.C. 1152, 1166 (1945)......................................................................34

*Zimmerman v. Norfolk Southern Corp.*,
   706 F.3d 170 (3d Cir. 2013)...................................................................19

## Statutes

18 USC §1621 .........................................................................................43

19 USC §1484 ...................................................................................*passim*

19 USC §1485 .........................................................................................19

19 USC §1485(a)(3).................................................................................17

19 USC §1520 .........................................................................................42

19 USC §1520(c) .....................................................................................42

19 USC §1592 ...................................................................................*passim*

19 USC §1592(a) ..........................................................................4, 20, 31, 38

19 USC §1592(c)(2)................................................................................19

19 USC §1592(e)(3) .......................................................................18, 19

19 USC §1592(e)(4) .......................................................................18, 33

26 USC §6653 ...................................................................................33

28 USC §1582 ...................................................................................14

28 USC §2639(a)(1) ..........................................................................40

**<u>Harmonized Tariff Schedule of the United States Provisions</u>**

General Rule of Interpretation 1 ........................................................45

Section XVI Note 1(l) .......................................................................46

Section XVII Note 2(e) ................................................................46, 48

Heading 8483 ..................................................................45, 46, 48, 55

Heading 8708 ........................................................................... *passim*

Heading 8709 .............................................................................13, 39

Subheading 8483.90.30 ................................................................52, 53

Subheading 8483.90.80 ...........................................................45, 49, 52

**<u>Legislative History</u>**

H. Rep. No. 103-361, *reprinted in* 1993 U.S.C.C.A.N. 2552, 2670-71 (1993) ................53

**<u>Regulations</u>**

19 CFR Part 171 Appendix B ............................................................51

19 CFR §351.225(e) (2010) ...............................................23, 30, 31, 36

19 CFR §351.225(f)(3) (2010) ...........................................................23

19 CFR §351.225(f)(4) (2010) ...........................................................23

19 CFR §351.225(k)(1) (2010) ...........................................................10

19 CFR §351.225(l)(3) .......................................................................26

19 CFR §351.225(n) (2010) ............................................................7, 23

19 CFR §351.225(o) (2010) ................................................................11

**<u>Administrative Decisions</u>**

*Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China*, 52 <u>Fed. Reg.</u> 22667 (June 15, 1987) ...........................................................................6

*Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, the People's Republic of China, and Romania*, USITC Publication 1983, Inv. Nos. 731-TA-341, 344, and 345 (final) (June 1987)....................................................................................6

*Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China:  Preliminary Results of the 2008-2009 Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 41148 (July 15, 2010) ............................................................10, 11, 22

*Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 76 Fed. Reg. 3086, 3087 (January 19, 2011).......7, 21

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China:  Final Results of the Expedited Third Sunset Review of the Antidumping Duty Order*, 76 Fed. Reg. 76143 (December 6, 2011) ...........................................................................11

*Tapered Roller Bearings from China*, USITC Publication 4343, Inv. No. 731-TA-344 (Third Review) (August 2012) ............................................8

*Tapered Roller Bearings from Korea*, Investigation No. 731-TA-1380 (Preliminary), USITC Publication No. 4721 (August 2017) ..................................9

*Notice of Scope Rulings*, 77 Fed. Reg. 9893 (Feb. 21, 2012) ...........................................11

NY C82026 (January 29, 1998)........................................................................47

NY F81211 (January 6, 2000) .........................................................................46

NY N198080 (January 13, 2012).....................................................................46

T.D. 78-174 (January 11, 1977)........................................................................54

**Other Authorities**

*Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27296 (May 19, 1997)..........26

*Proposed Customs Regulations Amendments Relating to Tariff Designation on Entry Documents*, 52 Fed. Reg. 36279 (September 28, 1987) .......................49, 50

Customs "Informed Compliance Publications" (available at https://www.cbp.gov/trade/rulings/informed-compliance-publications .................3

5A Wright & Miller, *Federal Practice and Procedure*, Civil 2d §1357, at 299 (1990)........................................................................................15

2A J. Moore & J. Lucas, Moore's Federal Practice para. 12.07, p. 12-64, and n. 6 (1985)........................................................................42

USCIT Rule 12(b)(6) .........................................................................14, 20, 40

UNITED STATES COURT OF INTERNATIONAL TRADE
HON. GARY S. KATZMANN, JUDGE

------------------------------------------------------------------------x
UNITED STATES                                          :
                                                       :
                              Plaintiff,               :        Court No. 22-00205
                                                       :
                    v.                                 :
                                                       :
WANXIANG AMERICA CORPORATION,                          :
                                                       :
                              Defendant.               :
------------------------------------------------------------------------x

**MEMORANDUM OF LAW
IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS**

**INTRODUCTION**

The Government's lawsuit against Wanxiang America (hereinafter "WXA") should be dismissed because the facts alleged in the Government's complaint fail to establish a violation of 19 USC §1592. The Government's effort to recover a whopping $100 million in duties and penalties is based on faulty legal premises concerning (a) when antidumping duties are owed and (b) alleged misclassifications by WXA.

The Government's antidumping duty claims require WXA to have been clairvoyant in order to avoid liability. The controlling law has repeatedly rejected any such requirement. A full *four years* after the Government published notice of its decision that wheel hub assemblies ("WHAs") were subject to tapered roller bearing ("TRB") antidumping duties, the Government impermissibly attempted to rewrite the legal obligations in effect at the time of entry.

1

The Government's misclassification claims fare no better. They require WXA to have made material misstatements of facts or omissions of such facts. The complaint does not allege that WXA made misstatements of facts or omissions or somehow misdescribed the products alleged to be misclassified. It alleges only that WXA made erroneous misclassifications (which WXA did not do). Classifications, whether correct or incorrect, are conclusions of law. They are not false statements, acts or omissions.

Turning to the antidumping duty issues, the Government's complaint states that there are ten (10) entries of WHAs that should have been declared as subject to antidumping duties. Cmpl. ¶¶ 20-28, 57-62. However, the Government makes a material omission in its complaint and this omission is fatal to the Government's §1592 case: the Commerce Department did not publish its decision that WHAs were considered to be within the scope of the antidumping duty order on TRBs until December 6, 2011. A comparison of the December 6, 2011 date with the date of the entries that the Government complains were not properly declared as subject to antidumping duties on TRBs (June 24, 2011 to November 30, 2011) shows that *__all__* of the WXA entries for which the government seeks to collect antidumping duties and penalties occurred *__prior to__* that date. *See* Attachment A ("Entries Covered by Antidumping Duty Order") to the Government's complaint. The Government now tries to hold WXA responsible for massive amounts of duties and penalties, even though WXAs entries were filed prior to the time the legal obligation to declare WHAs as TRBs was published.

The Government's complaint does not allege (nor did the administrative penalty proceedings in this case allege) that WXA had actual knowledge of the existence of Commerce's scope decision prior to December 6, 2011. WXA was not a party to the scope

proceedings, nor was it served with notice of their existence ***despite a legal requirement for Commerce to include WXA on the scope proceeding service list***.  WXA moves to dismiss the Government's complaint because, as a matter of law, Commerce is required to provide adequate notice to any reasonably informed importer that their product is subject to duty *before* any retroactive assessment of duties, let alone penalties.   The incontrovertible facts here demonstrate that the notice in this case was not provided until *after* the date of entry for each of the entries in question.

The Government also fails to mention that it was not until nearly four years *after* the Commerce Department's December 6, 2011 Federal Register notice that Customs, armed and loaded with the benefit of hindsight knowledge of Commerce's 2011 decision, sought to retroactively apply that decision to WXA's entries made from June 2011 to November 2011.  Customs seeks to hold WXA not to a negligence standard of reasonable care, but to a standard of clairvoyance.

The Government's conduct in 2015, and even in bringing this litigation, is based upon the assumption that the scope issues around WHAs in the context of the TRB order were well settled from time immemorial, and that WXA was importing TRBs without paying the antidumping duties applicable to TRBs.  Neither was true.  The Government's retroactive application of law enforcement posture ignores the very precepts of the Customs Modernization Act of 1993 that Customs cites in every one of its "Informed Compliance Publications" (available at https://www.cbp.gov/trade/rulings/informed-compliance-publications):

> Two new concepts that emerge from the Mod Act are "informed compliance" and "shared responsibility," which are premised on the idea that in order to maximize voluntary compliance with laws and regulations of U.S. Customs and Border Protection, ***the trade community needs to be***

> ***clearly and completely informed of its legal obligations.***  Accordingly, the Mod Act imposes a greater obligation on CBP to provide the public with improved information concerning the trade community's rights and responsibilities under customs regulations and related laws.

Emphasis added.  The Government's complaint should be dismissed because the legal obligation to enter WHAs as subject to the TRB order did not exist until December 6, 2011, and WXA should not be penalized for failing to exercise reasonable care in meeting a legal responsibility that was ***not*** communicated to the trade community at the time these entries were filed.

With regard to the Government's claims regarding tariff classification, WXA's imports were correctly described on the import documentation and its import declarations were factually accurate – indeed, the Government's complaint does not allege *any* facts to the contrary, and includes no assertion that the importer made false statements about its imports in connection with the entries.  This is not a case where WXA imported apples and described them as bananas on the import documentation.  The Government only alleges that WXA imported goods under a tariff provision with which it disagrees.  Such an allegation alone is insufficient to demonstrate a violation under 19 USC §1592 as a matter of law.  The Government's efforts to collect duties and penalties in this case based upon nothing more than reasonable, *bona fide* differences of opinion as to the tariff classification of the company's imported products fly in the face of congressional intent and years of judicial precedent.

In sum, the facts alleged by the government in its complaint, even if taken as true for purposes of this motion, do not – and cannot – establish a violation of 19 USC §1592(a).  Thus, its claims for duties and penalties based upon an alleged failure to deposit antidumping duties, and alleged incorrect tariff classifications, must be dismissed.

# FACTS

## I.   WXA AND WANXIANG GROUP CORPORATION

WXA, based in Elgin, Illinois, is an American company that imports goods from its parent corporation Wanxiang Group Corporation ("WGC").  WGC is a multinational automotive components manufacturing company headquartered in Hangzhou, Zhejiang province, China.  Cmpl. ¶¶ 3,6,7.

## II.   WHEEL HUB ASSEMBLIES IMPORTED BY WXA

### A.  Background

The articles covered by the entries listed in Attachment A ("Entries Covered by Antidumping Duty Order") to the Government's complaint are <u>not</u> TRBs.  They are dedicated automotive parts known as WHAs.[1]  The WHAs were exported by Wanxiang Qianchao Co., Ltd. ("WQC"), a Chinese subsidiary of WGC, and imported by WXA. Cmpl. ¶ 21.[2]

---

[1]  The Government refers to this merchandise as "wheel hub assemblies" (not TRBs) in the relevant portions of its complaint. See Complaint ¶¶ 20-28.

[2]  As explained further below, the remainder of ¶ 21 of the Government's complaint – that these WHAs "were covered by the TRB Order and were subject to the 'all others' deposit and liquidation rate of 92.84 percent" is not a fact, but a legal conclusion that WXA disputes.

### B. The Antidumping Duty Order Applicable To Tapered Roller Bearings From China

TRBs, unlike WHAs, are made up of four basic components – a cup, a cone, a cage, and rollers.[3]  The cup, also called the outer ring, is the largest part of the assembly, and its inner surface is tapered to conform to the angle of the roller assembly.  *Id.*  The cone forms the inner race of the bearing, while the cage keeps the rollers equally distributed around the cup and cone.  *Id.*  The rollers, cage, and cone are joined together to form a cone assembly.  *Id.*  When joined with a cup, the cone assembly and cup form a TRB set.  *Id.*



Figure 1
Tapered Roller Bearing

OUTER RING (CUP)    INNER RING (CONE)    ROLLING ELEMENTS (TAPERED ROLLERS)    CAGE

Commerce first published the antidumping duty order with respect to TRBs from China ("the TRB Order") on June 15, 1987.  *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China*, 52 Fed. Reg. 22667 (June 15, 1987).  Cmpl. ¶¶ 15-17.  The scope of the China TRB Order is as follows:

> [i]mports covered by the order are shipments of tapered roller bearings and parts thereof, finished and unfinished, from the PRC; flange, take up cartridge, and hanger units incorporating tapered roller bearings; and

---

[3]   *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, the People's Republic of China, and Romania*, USITC Publication 1983, Inv. Nos. 731-TA-341, 344, and 345 (final) (June 1987), at 8 and A-4.

tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use. These products are currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") item numbers 8482.20.00, 8482.91.00.50, 8482.99.15, 8482.99.45, 8483.20.40, 8483.20.80, 8483.30.80, 8483.90.20, 8483.90.30, 8483.90.80, 8708.99.80.15 and 8708.99.80.80. Although the HTSUS item numbers are provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

*Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 76 Fed. Reg. 3086, 3087 (January 19, 2011).

Apart from WHAs, WXA imported TRBs from its affiliates, but those imports are not at issue in this case. However, and as the Court is aware from the litigation in *Wanxiang America Corporation v. United States*, 399 F. Supp. 3d 1323 (Ct. Int'l Trade 2019), *aff'd* 12 F. 4th 1369 (Fed. Cir. 2021), following Commerce's publication of the antidumping duty order on TRBs from China in 1987, WGC (WXA's parent corporation) participated as a respondent in several administrative reviews of the TRB order in the mid-1990s and early 2000s with regard to TRBs and ultimately received a zero antidumping duty rate. As a participant in those reviews, WGC and WXA, per the explicit terms of Commerce's regulations (19 CFR §351.225(n) (2010)), were required to be notified about the existence of any application for a scope ruling. Commerce, however, never placed either of them on the scope service list.

### C. Scope Issues Relating To WHAs

The Government's complaint seeks to recover antidumping duties and penalties on WXA's WHAs imported from June to November 2011. Commerce published notice of its scope decision on WHAs on December 6, 2011 and that decision was ultimately upheld after years of litigation. WXA is not relitigating here whether WHAs are subject to the TRB order. That issue is settled and is not in dispute in this case.

The issue here is whether the Government, as a matter of law, can demand an importer pay millions of dollars in duties AND penalties for transactions that occurred prior to the time the Government published notice that WHAs were covered by the TRB antidumping duty order. As explained further below, the law is well settled that this would be an impermissible retroactive application of the antidumping duty laws so as a matter of law there can be no violation of 19 USC §1592.

WHAs are significantly different products than TRBs as can be seen from the pictures of WHAs shown below (compare to the picture of a TRB above):



*Tapered Roller Bearings from China*, USITC Publication 4343, Inv. No. 731-TA-344 (Third Review) (August 2012), at I-20. Indeed, a *majority* of domestic market participants responding to ITC questionnaires issued in connection with a sunset review of the TRB Order conducted less than a year after the entries in question were filed indicated that TRBs and WHAs do not have the same physical characteristics or end uses, citing, for example, that WHAs are dedicated for automotive use whereas TRBs have multiple applications and that WHAs incorporate additional features or parts, such as flanges or ABS components not found on TRBs. *Tapered Roller Bearings from China*, USITC Publication 4343 at 12. WHAs have additional structures and functions crucial to a vehicle's operation, including

driving torque transmission, braking torque transmission, ABS functionality, and alignment.  *Id.* at I-24.  All of these important functions are completely independent of the *bearing* functionality of the wheel hub assembly, and thus WHAs are viewed as automotive parts, rather than "bearings" by the industry.  *Id.* at I-27.  A *majority* of domestic market participants responding to the ITC sunset review questionnaires reported that

- TRBs and WHAs were not similar in terms of customer and producer perceptions;

- TRBs and WHAs were not similar in terms of price;

- the manufacturing processes for TRBs and WHAs are not similar; and

- TRBs and WHAs are not interchangeable.

*Tapered Roller Bearings from China*, USITC Publication 4343 at 13-14, I-28-I-30.  In fact, the petitioner in the antidumping duty proceeding covering TRBs from China – The Timken Company – has explicitly argued that these WHAs should <u>not</u> be included within the scope of the current antidumping duty investigation covering TRBs from *Korea* for this very reason.[4]  Put simply, the subject WHAs and TRBs are separate and distinct articles of commerce.

In light of these differences it was not self-evident to importers that WHAs would be subject to the TRB antidumping duty order.  Indeed, on March 5, 2010, a party named New Trend Engineering Ltd. ("New Trend") filed a request with Commerce to confirm that its WHAs were outside the scope of the AD Order.  In response, Commerce initiated a formal scope inquiry with regard to this merchandise – the same type of WHAs as the

---

[4]  *Tapered Roller Bearings from Korea*, Investigation No. 731-TA-1380 (Preliminary), USITC Publication No. 4721, August 2017, p. 13, n. 74 (summarizing arguments of petitioner The Timken Company).

subject WHAs imported by WXA – by notice dated June 15, 2010.  Copy attached as

Exhibit 1 to this Memorandum of Law in Support of Defendant's Motion to Dismiss.  In

that notice, Commerce explicitly acknowledged that the scope was ambiguous, stating:

> **The Department finds that it cannot determine whether New Trend's WHAs should be excluded from the scope of the Order** based solely upon New Trend's application for a scope clarification and the descriptions of the merchandise referred to in 19 CFR §351.225(k)(1).  Specifically, the information provided in New Trend's scope request is insufficient to determine whether or not its WHAs are considered tapered roller housing.  Therefore, in accordance with 19 CFR §351.225(e), the Department is initiating a scope inquiry.

Emphasis added.  Notably, the descriptions of the merchandise referred to in 19

CFR §351.225(k)(1) (2010) were:

> (1)  The descriptions of the merchandise contained in the petition,
> (2)  the initial investigation, and
> (3)  the determinations of the Secretary (including prior scope determinations) and the Commission.

Alas, even *Commerce* could not read the order or the proceedings from the TRB

investigation in order to decide that WHAs are TRBs for purposes of the antidumping duty

laws.

On July 15, 2010, Commerce published a <u>Federal Register</u> notice with the

preliminary results of the 2008–2009 Administrative Review of the TRB antidumping duty

order.  *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the*

*People's Republic of China:  Preliminary Results of the 2008-2009 Administrative Review*

*of the Antidumping Duty Order*, 75 <u>Fed. Reg.</u> 41148 (July 15, 2010).  In that notice,

Commerce explained that an unrelated foreign producer named New Torch had produced

and sold WHAs to the United States during the period of review "which it asserted were

not subject to the scope of the order on TRBs."  Noting that "[o]n June 15, 2010, the

Department initiated two scope inquiries on WHAs produced by PRC producers that are unrelated to the respondents in the instant administrative review," Commerce stated that "[f]or the purposes of these preliminary results, **because the Department has not yet determined whether WHAs are covered by the scope of the order on TRBs**, the Department will continue to base its antidumping margin calculation on New Torch's original U.S. sales database, which does not include WHAs." 75 Fed. Reg. at 41149.  Thus, as of at least July 2010, the Government agency responsible for antidumping duty scope interpretation (Commerce) had not "yet determined whether WHAs are covered" by the TRB order.

It was not until **December 6, 2011**, in a sunset review (not a scope proceeding), and after all the entries in question in this case had been filed, that Commerce finally published a Federal Register notice[5] advising the public that it had issued its final ruling rejecting New Trend's argument that its WHAs were outside the scope of the order.  This scope ruling was appealed and ultimately affirmed by the U.S. Court of International Trade

---

[5] *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China:  Final Results of the Expedited Third Sunset Review of the Antidumping Duty Order*, 76 Fed. Reg. 76143 (December 6, 2011), stating that (1) Commerce had determined on April 18, 2011 that New Trend's splined and non-splined WHAs without ABS elements are included in the scope of the order; and (2) New Trend's WHAs with ABS elements are also included in the scope of the AD Order.  However, Commerce's regulations provided that it will publish scope ruling notices on a quarterly basis.  See 19 CFR 351.225(o) (2010).  Inexplicably, Commerce did not publish the required quarterly notification of the New Trend scope ruling until February 21, 2012, almost a year after the final scope ruling was made.  See Notice of Scope Rulings, 77 Fed. Reg. 9893 (Feb. 21, 2012).

on May 29, 2013[6] and the U.S. Court of Appeals for the Federal Circuit on May 13, 2014.[7] Whether WHAs were finally determined to be within the scope of the TRB Order was not finally settled until 2014.

## II.     OTHER ARTICLES IMPORTED BY WXA

Between October 1, 2007 and September 30, 2012, WXA imported universal joints and parts thereof (including crosses, cross assemblies, yokes, caps, cups, bearing caps, and bearing kits), WHAs incorporating radial ball and tapered roller bearings, radial ball bearings, tapered roller bearings, and other parts and accessories of automobiles (including axle, cage for double offset joint of constant velocity axle (CV), race for CV axle used in utility vehicle, CV-joint part, tube assembly, and steering shaft for combine) into the United States.  Cmpl. ¶ 8-9.[8]

The Government's complaint alleges that WXA misclassified these articles at the time of entry under the Harmonized Tariff Schedule of the United States ("HTSUS").   See Cmpl. ¶¶ 29-50.  None of these paragraphs, however, asserts that WXA misdescribed the subject merchandise on its commercial invoices, omitted relevant factual information regarding the products from those invoices, or submitted any other material misstatement or omission of fact regarding these products when filing the entries in question.  Rather, each of the allegations in these paragraphs simply claims that WXA entered the goods

---

[6] *Power Train Components, Inc. v. United States*, 911 F. Supp. 2d 1338 (Ct. Int'l Trade 2013).

[7] *Power Train Components, Inc. v. United States*, 2014 U.S. App. LEXIS 9179 (Fed. Cir., May 13, 2014) (affirmed without opinion).

[8] As explained further below, the remainder of ¶ 9 of the Government's complaint – that these articles were entered by means of "materially false statements or omissions" is not a fact, but a legal conclusion that WXA disputes.

under one tariff provision (generally automobile parts under headings 8708 or 8709), but that these articles "are properly classifiable" under a different tariff provision. *Id*.

## III.     U.S. CUSTOMS AUDIT AND PENALTY CLAIM

WQC exported the subject WHAs from China and WXA entered them under cover of the ten entries identified on Attachment A ("Entries Covered by Antidumping Duty Order") of the Government's complaint. Cmpl. ¶ 20, Attachment A. The dates of entry for these ten entries ranged from **June 24, 2011 through November 30, 2011**. *Id*.

It was not until Regulatory Audit issued an audit report on September 2, 2015[9] (nearly four years after the entries in Exhibit A were filed and well after they were liquidated) that CBP sought to apply antidumping duties listed in Exhibit A to the Government's complaint for the first time, despite the fact that <u>all</u> of those entries were filed *before* December 6, 2011 – the earliest date that WXA could possibly have had notice that such duties could apply. Based exclusively upon the results of that audit, on April 11, 2019, CBP issued a notice to WXA demanding payment of $26,939,985.31 in antidumping duties, as well as an additional $53,879,970.62 in penalties, relating to the company's entries of the subject WHAs. Cmpl. ¶ 53. **<u>All</u>** of these duties and penalties stem from the alleged failure to deposit antidumping duties with respect to the ten entries of WHAs identified on Attachment A ("Entries Covered by Antidumping Duty Order") of the Government's complaint. Cmpl. ¶ 20, Attachment A.

The remainder of the duties and penalties claimed in the penalty notice dated April 11, 2019 and the Government's complaint in this case stem from the allegations that WXA

---

[9] A copy of the audit report may be found in CM/ECF #24-2 of *Wanxiang America Corp. v. United States*, Court # 18-120.

misclassified parts and accessories of automobiles.   These tariff classification claims,

claimed loss of revenue and associated penalties are set forth below:

| Alleged Violation | Alleged Loss of Revenue | Penalty |
| --- | --- | --- |
| Misclassification–Bearings and Parts (Cmpl. ¶¶ 29-33) | $    602,102.32 | $   1,204,204.64 |
| Misclassification– U-joints and parts before July 1, 2009 (Cmpl. ¶¶ 34-39) | $  1,684,404.16 | $   3,368,808.32 |
| Misclassification– U-joints and parts after July 1, 2009 (Cmpl. ¶¶ 34-38, 40) | $  1,889,419.23 | $   7,557,676.92 |
| Claim duty-free for Agricultural Use (Cmpl. ¶¶ 41-45) | $       20,755.15 | $        83,020.60 |
| Other Misclassification of parts and accessories of automobiles (Cmpl. ¶¶ 46-50) | $       48,542.94 | $        97,085.88 |

## LEGAL BACKGROUND

### I.    JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 USC §1582.

In deciding a motion to dismiss for failure to state a claim for which relief may be

granted, the Court must determine whether the facts alleged would entitle the plaintiff to

the relief requested.   "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds'

of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007) (internal citations and quotations omitted).   Indeed, "[f]actual

allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965.

Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face, *i.e.*, a claim that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See*, *e.g., Totes-Isotoner Corp. v. United States*, 569 F. Supp. 2d 1315, 1325 (Ct. Int'l Trade 2008). In analyzing a motion to dismiss, the Court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant. *See id*.

To determine the sufficiency of a claim, consideration is limited to the facts stated on the face of the complaint, documents appended to the complaint, and documents incorporated in the complaint by reference. *See Fabrene, Inc. v. United States*, 17 Ct. Int'l Trade 911, 913 (1993) and *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). The court may also consider matters of public record, and items appearing in the record of the case. *See Fabrene* at 913, *citing* 5A Wright & Miller, *Federal Practice and Procedure*, Civil 2d §1357, at 299 (1990). Dismissal is proper "where it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1565 (Fed. Cir. 1988) (*citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)), *cert. denied*, 488 U.S. 892 (1988), *Fabrene* at 913.

## II.   CUSTOMS ENTRY REQUIREMENTS

Section 1484 of Title 19 sets forth the requirements and timing for making entry of imported merchandise into the United States in relevant part as follows:

   (a)  Requirement and time

(1) Except as provided in sections 1490, 1498, 1552, and 1553 of this title, one of the parties qualifying as "importer of record" under paragraph (2)(B), either in person or by an agent authorized by the party in writing, shall, **using reasonable care** –

> (A) make entry therefor by filing with the Bureau of Customs and Border Protection such documentation or, pursuant to an authorized electronic data interchange system, such information as is necessary to enable the Bureau of Customs and Border Protection to determine whether the merchandise may be released from custody of the Bureau of Customs and Border Protection;

> (B) complete the entry, or substitute 1 or more reconfigured entries on an import activity summary statement, by filing with the Customs Service the declared value, classification and rate of duty applicable to the merchandise, and such other documentation or, pursuant to an electronic data interchange system, such other information as is necessary to enable the Customs Service to –

>> (i) properly assess duties on the merchandise,
>> (ii) collect accurate statistics with respect to the merchandise, and
>> (iii) determine whether any other applicable requirement of law (other than a requirement relating to release from customs custody) is met.

* * * *

  (d)    Signing and contents.

(1) Entries shall be signed by the importer of record, or his agent, unless filed pursuant to an electronic data interchange system. If electronically filed, each transmission of data shall be certified by an importer of record or his agent, one of whom shall be resident in the United States for purposes of receiving service of process, as being true and correct to the best of his knowledge and belief, and such transmission shall be binding in the same manner and to the same extent as a signed document. **The entry shall set forth such facts in regard to the importation as the Secretary may require** and shall be accompanied by such invoices, bills of lading, certificates, and documents, or their electronically submitted equivalents, as are required by regulation.

19 USC §1484, emphasis added.

Similarly, 19 USC §1485(a)(3) provides that "[e]very importer of record making an entry under the provisions of section 484 of this Act [19 USC §1484] shall make and file or transmit electronically therewith, in a form and manner to be prescribed by the Secretary of the Treasury, a declaration under oath, stating . . . [t]hat all other statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct."

## III.   CUSTOMS PENALTY CLAIMS UNDER 19 USC §1592

Section 1592 of Title 19 provides specific penalties for making materially false statements, acts or omissions in connection with the filing of an entry, whether through fraud, gross negligence, or negligence.  Specifically, 19 USC §1592(a) provides in relevant part that "no person, by fraud, gross negligence, or negligence . . . may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of . . . any document or electronically transmitted data or information, written or oral statement, or act which is material and false or any omission which is material."  Based upon the plain language of the statute, it is well established that in order for §1592 liability to apply to an entry, introduction, attempted entry or introduction of merchandise into the United States, the following three requisite elements of the statute must be present:

1. A false statement, act or omission that is also

2. Material, and

3. Culpable (*i.e.*, occurred as a result of the party's negligence, gross negligence or fraud)

*See*, *e.g., United States v. Green Planet, Inc.*, 494 F. Supp. 3d 1356, 1359-60 (Ct. Int'l Trade 2021).

If one of these requisite elements of the statute is not present, there is no §1592 liability.  For example, if the agency is unable to establish the existence of a false statement, act or omission in connection with the subject entries, there is no violation of §1592 – without the existence of this first element of the statute, the Court need not look to the other elements (*i.e.*, materiality and culpability) given that the first element is a pre-requisite to establishing §1592 liability and necessary before proceeding to evaluate materiality and culpability.

When the monetary claim brought by the government is based on negligence, "the United States shall have the burden of proof to establish the act or omission constituting the violation, and the alleged violator shall have the burden of proof that the act or omission did not occur as a result of negligence."  19 USC §1592(e)(4).  In contrast, in claims based upon gross negligence, "the United States shall have the burden of proof to establish *all the elements* of the alleged violation." 19 USC §1592(e)(3) (emphasis in original), *United States v. Nitek Elecs., Inc.*, 844 F. Supp. 2d 1298, 1308 n.9 (Ct. Int'l Trade 2012), *aff'd by United States v. Nitek Elecs., Inc.*, 806 F.3d 1376 (Fed. Cir. 2015).[10]

Importantly, the term "negligence" is not defined separately in the statute. Accordingly, it carries its ordinary common law meaning when used in the Tariff Act.  *See, e.g., Neder v. United States*, 527 U.S. 1, 21 (1999) ("It is a well-established rule of

---

[10]   Subsection (d) of the statute, entitled "Deprivation of lawful duties, taxes, or fees," provides that "[n]otwithstanding section 1514 of this title, if the United States has been deprived of lawful duties, taxes, or fees as a result of a violation of subsection (a) of this section, the Customs Service shall require that such lawful duties, taxes, and fees be restored, whether or not a monetary penalty is assessed."  Proof of a violation of 19 USC §1592(a) is therefore a prerequisite for recovery of duties, taxes or fees pursuant to 19 USC §1592(d).  *See, e.g., Pentax Corp. v. Robison*, 125 F.3d 1457 (Fed.Cir. 1997) and *United States v. Blum*, 858 F.2d 1566 (Fed.Cir. 1988).

construction that where Congress uses terms that have accumulated settled meaning under
. . . the common law, a court must infer, unless the statute otherwise dictates, that Congress
means to incorporate the established meaning of these terms.") (citations omitted);
*Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911) ("[W]here words are
employed in a statute which had at the time a well-known meaning at common law or in
the law of this country, they are presumed to have been used in that sense unless the context
compels to the contrary.") (citations omitted).  That meaning implies a duty, the breach of
that duty, and harm causally flowing from breach of that duty. *See Huffman v. Union
Pacific R.R.*, 675 F.3d 412, 418 (5th Cir. 2012) ("negligence . . . requires proof of breach
of a standard of care, causation, and damages.") (*citing Consolidated Railroad v. Gottshall*,
512 U.S. 532, 540 (1994)); *Zimmerman v. Norfolk Southern Corp.*, 706 F.3d 170, 189 (3d
Cir. 2013) ("The well-worn elements of common-law negligence are . . . duty, breach,
causation, and damages."); *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006)
(identifying "the traditional common law elements of negligence: duty, breach,
foreseeability, and causation.").

As noted earlier, the legal obligations (*i.e.*, "duties") regarding the filing of
documents in connection with the entry of merchandise set forth in the Tariff Act which
could give rise to a negligence claim are those spelled out in §§1484 and 1485.  As stated
above, those statutes require the importer to "set forth such ***facts*** in regard to the
importation as the Secretary may require" (emphasis added), and to certify that those facts
are true.  It is the material misstatement or omission of those ***facts*** that, if occurring through
fraud, gross negligence or negligence, are subject to penalty under 19 USC §1592.  Sections
1592(c)(2) and (c)(3) are thus inextricably tied to §§1484 and 1485.

## ARGUMENT

Even if taken as true for purposes of this motion, the facts alleged by the Government in its complaint do not – and cannot – establish a violation of 19 USC §1592(a).  Nothing in the Government's complaint demonstrates that WXA entered the subject merchandise by means of any false statement, act or omission – either with respect to the declaration and deposit of antidumping duties or the tariff classification of the articles in question.  Moreover, the declarations made by WXA at the time of entry with regard to this merchandise could not be considered negligent (or, with respect to the tariff classification, grossly negligent) *as a matter of law*.  As explained in greater detail below, the Government's complaint fails to state any facts that would entitle it to the lost revenue or penalties sought in Counts One through Nine, and therefore this case must be dismissed in its entirety pursuant to USCIT Rule 12(b)(6).

I.    **THE COMPLAINT FAILS TO STATE A CLAIM THAT WXA NEGLIGENTLY VIOLATED 19 USC §1592 WITH RESPECT TO ITS ENTRIES OF WHAs.**

As a matter of law, the WHAs imported by WXA were properly treated as *outside* the scope of the TRB Order until December 6, 2011– *i.e.*, the date when Commerce first published a <u>Federal Register</u> notice that a preliminary scope determination including this merchandise *within* the scope had been issued to a different and unrelated importer, New Trend.  Entries of such WHAs filed prior to that date without antidumping duty deposits were not "misrepresented" or even merely incorrect.  They were accurate and correct *based on the law as published at the time of en*try.  As a result, WXA cannot be liable for negligence as a matter of law even if the facts the Government asserts in its complaint are true.

**A. Information derived solely from the public record conclusively demonstrates that WHAs were *not* within the scope of the TRB Order, and Commerce did not advise WXA or the public that it had reached a contrary conclusion, until December 2011.**

Paragraph 25 of the Government's complaint asserts that WXA's "failure" to deposit antidumping duties for the ten entries covering the subject WHAs "resulted in an actual loss of antidumping duties of $26,939,985.31." The basis of this claim is that WXA failed to identify the antidumping case number on the entries (Cmpl. ¶24) and falsely represented that the entries were not subject to antidumping duties (Cmpl. ¶23). The Government's claims are based solely upon the assumptions that the subject WHAs were within the scope of the TRB Order and that there was a legal *obligation* to declare and deposit antidumping duties on WHAs *at the time the entries in question were filed* – i.e., during the period from June 24, 2011 through November 30, 2011. *There was not*.

As noted above, the scope of the China TRB Order is as follows:

> [i]mports covered by the order are shipments of tapered roller bearings and parts thereof, finished and unfinished, from the PRC; flange, take up cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use. These products are currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") item numbers 8482.20.00, 8482.91.00.50, 8482.99.15, 8482.99.45, 8483.20.40, 8483.20.80, 8483.30.80, 8483.90.20, 8483.90.30, 8483.90.80, 8708.99.80.15 and 8708.99.80.80. Although the HTSUS item numbers are provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

*Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 76 Fed. Reg. 3086, 3087 (January 19, 2011).

*As can be seen from the plain language of the order, WHAs are not specifically listed in the order.* WHAs also are not clearly included in the scope of the TRB Order based upon the descriptions of the merchandise contained in the original antidumping duty

petition, the initial investigation, and the determinations of Commerce (including prior

scope determinations) and the International Trade Commission (*i.e.*, "the (k)(1) factors").

The Government cannot dispute this point because Commerce *itself* stated so in its letter

of June 15, 2010 initiating a formal scope inquiry with regard to WHAs imported by New

Trend (*see* Exhibit 1 to this Memorandum of Law in Support of Defendant's Motion to

Dismiss):

> **The Department finds that it cannot determine whether New Trend's
> WHAs should be excluded from the scope of the Order** based solely
> upon New Trend's application for a scope clarification and the descriptions
> of the merchandise referred to in 19 CFR §351.225(k)(1).

Emphasis added.

Commerce also made a similar statement on July 15, 2010, when it published a

Federal Register notice with the preliminary results of the 2008–2009 Administrative

Review of the AD Order.  75 Fed. Reg. 41148 (July 15, 2010).  In that notice, Commerce

explained that an unrelated foreign producer named New Torch had produced and sold

WHAs to the United States during the period of review "which it asserted were not subject

to the scope of the order on TRBs."  Noting that "[o]n June 15, 2010, the Department

initiated two scope inquiries on WHAs produced by PRC producers that are unrelated to

the respondents in the instant administrative review," Commerce stated that "[f]or the

purposes of these preliminary results, **because the Department has not yet determined**

**whether WHAs are covered by the scope of the order on TRBs**, the Department will

continue to base its antidumping margin calculation on New Torch's original U.S. sales

database, which does not include WHAs."  75 Fed. Reg. at 41149.

Importantly, even though scope determination requests covering these goods were

filed by these other, unrelated parties in early 2010, Commerce gave no notice to WXA of

those proceedings, or otherwise informed WXA that it regarded the WHAs imported by WXA as being within the scope of the antidumping duty proceeding.  Commerce's regulations provided that it must establish a "scope service list" that "will include all persons that have participated in any segment of the proceeding."  These regulations further provide that Commerce will notify all parties on the Department's scope service list of the initiation of a scope inquiry[11], the issuance of a preliminary scope ruling (including an invitation to comment)[12] and the issuance of a final scope ruling (including an explanation of the factual and legal conclusions on which the final ruling is based).[13]

Despite this clear regulation, no Wanxiang entity appears on the "comprehensive scope service list" applicable to antidumping duty case number A-570-601 during the period in question (copy attached as Exhibit 2 to this Memorandum of Law in Support of Defendant's Motion to Dismiss), even though this is (a) purported to be "a comprehensive list of all parties who have participated in any segment of an Antidumping or Countervailing Duty proceeding involving the subject merchandise in accordance with §351.225(n) of the Commerce Department Regulations (19 CFR Part 351.225(n)(2001))" and (b) Wanxiang participated in a segment of the antidumping duty proceeding.  As a result of the Commerce Department's failure to follow its regulation, Wanxiang was not served with any of the filings, the Commerce Department preliminary scope ruling or the Commerce Department final scope ruling in the New Trend scope request.  Of course, had Commerce done so, WXA could have participated in the proceedings or, at the very least, known of their existence.  Since Commerce failed to notify WXA of the existence of the

---

[11]  19 CFR §351.225(e) (2010).
[12]  19 CFR §351.225(f)(3) (2010).
[13]  19 CFR §351.225(f)(4) (2010).

ongoing scope proceedings and this failure most definitely affected WXA's rights (the instant $100 million lawsuit makes the prejudice to WXA patently clear), the earliest possible *constructive* notice date creating a legal obligation to declare entries of such merchandise to be subject to antidumping duties was **<u>December 6, 2011</u>** – the date on which the Commerce Department published notice in the <u>Federal Register</u> that it had reached a final administrative decision on this issue.

Based upon the above, therefore, the following facts – derived solely from the complaint and the public record – are indisputable:

- WHAs are not clearly within the scope of the TRB Order based upon the descriptions of the merchandise contained in the original antidumping duty petition, the initial investigation, and the determinations of Commerce (including prior scope determinations) and the International Trade Commission;

- WXA filed its entries of subject WHAs from June 24, 2011 through November 30, 2011;

- WXA was not on the applicable scope service list, and therefore was not notified of the initiation of a scope inquiry with respect to the subject WHAs, the issuance of a preliminary scope ruling (including an invitation to comment), or the issuance of a final scope ruling with respect to this merchandise; and

- Commerce first published its <u>Federal Register</u> notice advising the public that it had determined WHAs to be within the scope of the TRB Order on December 6, 2011.

The Government does not allege any contrary facts in its complaint, and, indeed, could not develop any such facts if its claim were allowed to proceed at this stage. The Government has not alleged any facts to show anything more than (1) there was an antidumping duty order on TRBs and (2) WXA imported products from June to November 2011 but failed to pay antidumping duties on those entries. The Government conveniently omits citing to the date on which Commerce notified the trade letting it know that WHAs

were considered TRBs for antidumping purposes – and that date was December 6, 2011. As a result, the Government's theory of the case is that WXA had a legal duty to see into the future in order to know its WHAs would be considered "in scope."

### B. There was no legal duty to file wheel hub assembly entries with identification of an antidumping duty case number and with deposit of antidumping duties prior to December 2011.

As a matter of law, prior to December 2011, there was simply *no legal obligation* on the part of WXA to conclude that the subject WHAs were within the scope of the order, to enter the goods as "Type-03" antidumping entries, or to deposit antidumping duties for such shipments.  Absent such a legal obligation, the Government, *as a matter of law*, cannot prove its claim of negligence based upon the facts alleged in its complaint.

Commerce itself has recognized the manifest unfairness of holding importers responsible for treating merchandise within the scope of an order before receiving notice that the agency has issued either a preliminary or final *affirmative* scope ruling (whichever occurs first).   In the preamble to the antidumping regulations applicable in this case, Commerce explained that, absent notice of such an affirmative ruling, an importer's understanding that both Customs and Commerce viewed the merchandise as *not* within the scope was justified:

> Suspension of liquidation is an action with a potentially significant impact on the business of U.S. importers and foreign exporters and producers.  The Department should not exercise this governmental authority before it has first given all parties a meaningful opportunity to present relevant information and defend their interests, and before the Department gives a reasoned explanation for its action. *Formal initiation of a scope inquiry by the Department* represents nothing more than a finding by the Department that *it cannot resolve the issue on the basis of the plain language of the scope description or the clear history of the original investigation. **It would be extremely unfair to importers and exporters to subject entries not already suspended to suspension of liquidation and possible duty assessment with no prior notice*** and based on nothing more than a domestic

25

*interested party's allegation.* Because, ***when liquidation has not been suspended, Customs, at least, and perhaps the Department as well, have viewed the merchandise as not being within the scope of an order, importers are justified in relying upon that view, at least until the Department rules otherwise***. Therefore, the Department will not order the suspension of liquidation until it makes either a preliminary or final affirmative scope ruling, whichever occurs first.

*Antidumping Duties; Countervailing Duties,* 62 <u>Fed. Reg.</u> 27296, 27328 (May 19, 1997) (emphasis added).

Litigation in recent years has enshrined this position into law, clarifiying the legal obligation of an importer when the scope of a potentially applicable antidumping duty order is unclear, as well as the extent of the Government's authority to retroactively assess antidumping duties with respect to entries of such products.

Specifically, *Sunpreme Inc. v. United States*, 946 F. 3d 1300, 1321 (Fed. Cir. 2020) (*en banc*) held that Customs has independent authority to suspend liquidation of entries when it determines that the goods fall within the scope of an ambiguous antidumping or countervailing duty order.  The Federal Circuit in *Sunpreme* further held, however, that where the scope of an antidumping duty order is ambiguous *and Customs has not already suspended liquidation of entries under the order*, "Commerce may not suspend liquidation in a manner that causes merchandise that previously entered not subject to duties to be retroactively brought within the scope of duty orders. . . When Commerce rules that a product falls within the scope of an order, but 'there has been no [previous] suspension of liquidation,' a new suspension must be ordered beginning only 'on or after the date of initiation of the scope inquiry.'  Anything else would be impermissibly retroactive . . ." *Sunpreme*, 946 F. 3d at 1319, *quoting* 19 CFR §351.225(l)(3).  *See also AMS Assocs. v.*

*United States*, 881 F. Supp. 2d 1374 (Ct. Int'l Trade 2012), *aff'd*, 737 F.3d 1338 (Fed. Cir. 2013).

This Court applied these principles in *United Steel & Fasteners, Inc. v. United States*, 203 F. Supp. 3d 1235 (Ct. Int'l Trade 2017), *aff'd*, 947 F.3d 794 (Fed. Cir. 2020). In that case, Commerce issued a final scope ruling to the plaintiff determining that its products were included within the scope of the antidumping duty order applicable to certain helical spring lock washers from China, and instructed Customs to retroactively suspend liquidation of all unliquidated entries of this merchandise filed by the plaintiff dating back to the beginning of the order – even though Customs had not previously independently suspended liquidation of the plaintiff's entries. The Court forcefully rejected the assessment of antidumping duties before the plaintiff had notice that its products were considered within the scope:

> Defendant attempts to justify Commerce's suspension instructions by maintaining that Plaintiff 'was on notice that its entries were potentially subject to antidumping duties.' . . . Defendant's argument is unpersuasive. *The plain language of the scope of the Order was unclear.* At oral argument, Defendant conceded that, 'in some instances the language of the order can be so abundantly clear and applicable that you don't have to go to (k)(1), but that isn't the case here.' . . . As stated above, Customs did not assess antidumping duties on imports of AREMA washers. Commerce was compelled to examine the (k)(1) factors and issue a final scope ruling to clarify that AREMA washers were included within the scope of the Order. *Commerce was required to adhere to its own policy that '[i]t would be extremely unfair to importers and exporters to subject entries not already suspended to suspension of liquidation and possible duty assessment with no prior notice* . . . . Because, when liquidation has not been suspended, Customs, at least, and perhaps the Department as well, have viewed the merchandise as not being within the scope of an order, *importers are justified in relying upon that view, at least until the Department rules otherwise.*' Final Rule, 62 <u>Fed. Reg.</u> at 27,328. Commerce's determination that Plaintiff's merchandise is covered by the pre-defined scope does not grant the Department authority to retroactively suspend liquidation and require cash deposits. All affirmative scope determinations in effect state that certain merchandise has always been included within the scope of an

order.  See *AMS Assocs. I*, 881 F. Supp. 2d at 1382 ('[B]y definition Commerce decides in [scope] proceedings whether the product involved falls within the previously-defined scope.').  Commerce's regulations provide, however, that such merchandise will not be considered covered by an order ***for purposes of duty liability*** until Commerce issues a preliminary or final scope ruling, whichever occurs earlier.  See 19 C.F.R. §351.225(l).  Plaintiff was first put on notice of what conduct was regulated by the order when Commerce issued its final scope ruling.

*US&F*, 203 F. Supp. 3d at 1254 (bold and italics added).

Court decisions issued subsequent to *US&F* have likewise *uniformly prohibited* the retroactive assessment of antidumping duties prior to the date the importer received adequate notice that an ambiguous antidumping duty order applied to its merchandise.  In *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2020), the Court of Appeals held that a Commerce notice initiating an anti-circumvention inquiry (a type of scope inquiry) with respect to goods exported by Zhongwang – a party unrelated to the plaintiff – did not provide adequate notice to the importer (Tai-Ao) that its shipments could be covered by the inquiry.  Moreover, language in the Initiation Notice stating that Commerce "intend[ed] to consider whether the inquiry should apply to *all imports* . . . regardless of producer, exporter, or importer, from the PRC" (emphasis added) did *not* provide sufficient notice that all shipments other than those of Zhongwang would be covered by the inquiry.  As a result, *Tai-Ao* held that Commerce could *not* suspend liquidation and assess antidumping and countervailing duties on entries made on or after the date of the Initiation Notice in the anticircumvention inquiry, but could only do so with respect to entries filed on or after Commerce *published notice of its Preliminary Determination in the Federal Register* eight months later.  The *Tai-Ao* Court explained that this "notice requirement reflects 'the *broader due-process principle that **before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must***

28

*'**provide regulated parties fair warning of the conduct [the order or regulation] prohibits or requires**.'" Tai-Ao*, 983 F.3d at 495, internal citations omitted (emphasis added).

This Court explicitly relied upon the *Tai-Ao* decision as the basis for its holding in *Trans Tex. Tire, LLC v. United States*, 519 F. Supp. 3d 1289, 1304-05 (Ct. Int'l Trade 2021). In *Trans Tex*, Commerce excluded "certain on-the-road steel wheels that are coated entirely in chrome" imported by the plaintiff from its preliminary CVD determination, but subsequently determined in its final CVD scope determination that the order included such merchandise. Although liquidation of the plaintiff's entries of such products was suspended as of the time of the preliminary determination, this Court correctly held that "reasonably informed *importers were not provided clear or meaningful notice of the inclusion* of [the subject merchandise] *until the publication of the Final Scope Memo*" *in the Federal Register*, and therefore "duties should have been assessed from the date of the Final Scope Memo, *when Plaintiffs first received notice* that PVD chrome wheels were not subject to the exclusion, rather than the date of the Preliminary Determination and suspension of liquidation." *Trans Tex*, 519 F. Supp. 3d at 1305 (emphasis added).

The ruling in *Trans Tex* is directly relevant to this case for several reasons. First, this Court explicitly and correctly *rejected* the Government's argument – as did both the CIT and the Court of Appeals for the Federal Circuit in *US&F* – that a scope determination "merely confirms" that the product in question was "always" within the scope of the applicable order. *Trans Tex*, 519 F. Supp 3d at 1302, *US&F*, 947 F.3d. at 803 ("[A] scope ruling does not merely 'confirm' the scope of an antidumping duty order but instead clarifies the unclear scope of the order and whether the particular product at issue falls within that scope."). Second, *Trans Tex* crystallizes the holdings in *Tai-Ao* and *US&F* in

clearly stating that "[r]etroactively assessing duties where importers received inadequate notice of their products' inclusion in the scope of a CVD investigation would be unfair." *Trans Tex*, 519 F. Supp. 3d at 1305.  Third, this Court plainly noted that antidumping or countervailing duties cannot be assessed retroactively where the relevant order is ambiguous, even where the importer "could have anticipated" that its products may have been included within the scope of the order.  *Id*.  ("The court does not question, nor is it germane, whether some importers could have anticipated the limits of the exclusion.").

Indeed, the question is not whether given articles were always within the scope of an order.  Rather, the question is ***at what point has ambiguous scope language been clarified to the degree that it is reasonable and fair to assess antidumping or countervailing duties against imports of those products***.  On this crucial question, the decisions in *AMS*, *Sunpreme*, *Tai-Ao*, *US&F* and *Trans Tex* are *all* in accord – where an antidumping duty order is unclear with respect to the coverage of an article within its scope, the legal obligation to declare imports of that article as subject to the order and liability for any applicable antidumping duties begins when a scope determination has been issued and the importer has received adequate notice of the decision.  Assessment of antidumping duties prior to this point "would be impermissibly retroactive . . ."  *Sunpreme*, 946 F. 3d at 1319.

The law is perfectly clear and applied to the facts of this case, it requires dismissal of the Government's antidumping claims.  The plain language of the scope of the TRB Order did *not* clearly cover WHAs, demonstrated by the fact that Commerce twice stated as much in June 2010 and again in July 2010, and Commerce commenced a formal scope inquiry with regard to this merchandise under 19 CFR §351.225(e) (2010).  *See* Exhibit 1

to this Memorandum of Law in Support of Defendant's Motion to Dismiss.  The opening of the formal scope inquiry, not to mention the Government's statements at the time, establishes that WHAs are not unambiguously within the scope of the TRB order.  Initiation of a formal scope inquiry indicates "that the issue of whether a product is included within the scope of an order or a suspended investigation cannot be determined based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section."  19 CFR §351.225(e) (2010).  The scope of the TRB Order was only clarified to include the subject WHAs when Commerce issued its scope determination to New Trend, and WXA was only provided notice of this determination on December 6, 2011 – the date when Commerce published a <u>Federal Register</u> notice first advising the public that it had determined WHAs to be within the scope of the TRB Order.

The legal obligation to declare imports of the subject WHAs as subject to the TRB Order and liability for any applicable antidumping duties thus began on this date, and the assessment of antidumping duties on the subject WHAs *before* this date "would be impermissibly retroactive."  The Government's complaint alleges that WXA filed its entries of subject WHAs from June 24, 2011 through November 30, 2011.  As all of these entries at issue were filed prior to December 6, 2011, there was no legal obligation to treat the subject WHAs as within the scope of the TRB Order, to enter the goods as "Type-03" antidumping entries, or deposit antidumping duties for such shipments.  Absent such a legal obligation, the Government cannot prove its claim of negligence based upon the facts alleged in its complaint *as a matter of law*, and the claim with respect to the alleged negligent failure to declare and deposit antidumping duties under 19 USC §1592(a) must be dismissed.

**C. WXA cannot be deemed negligent for filing entries without identification of an antidumping duty case number and without deposit of antidumping duties when the legal requirement to do so did not clearly exist.**

At the time the entries in question in were filed (i.e., June 24, 2011 through November 30, 2011), there was no legal requirement to treat the WHAs as subject to antidumping duties because there was no published decision to indicate that such products – lacking many of the "basic components of a tapered roller bearing" and including significant non-bearing functionality integral to the operation of a motor vehicle – were covered by the order.

In the months and years after the first published notice in the Federal Register, the question of whether the WHAs would ultimately be subject to antidumping duties remained unsettled, and contested in active litigation.  Indeed, Commerce's December 6, 2011 scope decision was not finally upheld until the 2014 Federal Circuit decision in *Power Train*.  A retrospective examination of the voluminous record in the *Power Train* case,[14] including comments filed during the administrative proceedings by Power Train, New Trend, Timken, Bosda and others, conclusively demonstrates the significant differences of opinion on the issue of whether WHAs were TRBs for antidumping duty purposes.  The extended litigation regarding the issue demonstrates that the scope issue was, at the very least, *arguable*, and WXA's position with regard to that issue *reasonable* – particularly when (as discussed above) WXA's reasonableness is measured before any public notice from Commerce of the scope decision.  As the scope issue was not finally decided – either

---

[14]  *See* docket in the Court of International Trade's CM/ECF system for *Power Train Components, Inc. v. United States*, Case 1:11-cv-00153.

administratively or judicially– until **after** each of the entries in question was filed, it is clear that WXA cannot be deemed negligent *as a matter of law*.

As explained earlier, once a material misstatement or omission is established under the penalty statute, "the alleged violator shall have the burden of proof that the act or omission did not occur as a result of negligence." 19 USC §1592(e)(4). The Court of International Trade has noted that "[l]imited case law explicates how this shift of burden operates and what the alleged violator must establish to disprove negligence as a legal conclusion." *United States v. Optrex Am., Inc.*, 30 Ct. Int'l Trade 650, 662 (2006).

However, courts have considered this very question numerous times in the tax context in cases involving negligence claims against taxpayers who are alleged to have underpaid their taxes.[15] Federal courts have uniformly and consistently held that a party cannot be negligent where its interpretation of law has not been settled by a court of last resort and reasonable differences of opinion on the issue may be entertained. These decisions are highly probative here because, as in cases brought under 19 USC §1592, once an error on a tax return has been demonstrated it is *the taxpayer* who bears the burden of proving that they acted "reasonably, prudently, and with due care in preparing and filing [their] Federal income tax returns" in order to avoid a negligence penalty. *Barter Sys., Inc. v. Commissioner*, Docket No. 4848-87, 1990 Tax Ct. Memo LEXIS 125, at *19 (T.C. Mar. 12, 1990), *citing Bixby v. Commissioner*, 58 T.C. 757, 791-792 (1972) and *McAlister v. Commissioner*, T.C. Memo. 1989-177.

---

[15] Prior to 1989, the tax penalty statute at 26 USC §6653 provided that "[i]f any part of any underpayment . . . of tax required to be shown on a return is due to negligence (or disregard of rules or regulations), there shall be added to the tax an amount equal to 5 percent of the underpayment." This language was substantially transferred to the new 26 USC §6662 by Pub. L. 101-239.

Federal courts have consistently held that "no part of such underpayment [may be] due to negligence or intentional disregard of the rules and regulations [where] the deficiency was due to a mistake of unsettled law on which there can be an honest difference of opinion." *Barter Sys., Inc.* 1990 Tax Ct. Memo LEXIS 125 at \*20. *See also Everson v. United States,* 108 F.3d 234, 237-38 (9th Cir. 1997) ("When a legal issue is unsettled, or is reasonably debatable, an underpayment generally will not [be found negligent]."), *Wofford v. Commissioner*, 5 T.C. 1152, 1166 (1945) ("If the petitioner was mistaken, as he evidently was, as to the controversial question of what the legal effect of the assignment for income tax purposes was, that is not a sufficient reason for holding that he was negligent."), *Dillin v. Commissioner*, 56 T.C. 228, 248 (1971) ("This case involved substantial questions of law and fact and as such we find that the petitioners were not negligent in failing to pay their taxes, their confusion was certainly not unreasonable."), and *Lemery v. Commissioner*, 54 T.C. 480, 490 (1970) ("We have examined the record herein with great care, and have included many salient facts bearing on this issue in our findings.  Many of these facts are unfavorable to petitioner, but while the issue is not free from doubt, we feel that O.D. 468, *supra*, created such confusion and uncertainty on the question of this petitioner's residence that we cannot say his actions were due to 'negligence or intentional disregard of rules and regulations.').[16]

---

[16] The unsettled nature of the law also has been held to constitute an absolute defense to a legal malpractice claim grounded in negligence.  In *Biomet Inc. v. Finnegan Henderson LLP*, the Court of Appeals for the D.C. Circuit held that the existence of unsettled law immunizes an attorney's informed judgment on a legal question *even where that attorney's interpretation was ultimately held to be erroneous*.  The court explained that

> Recently . . . . we noted that "**[t]he uncertainty at the time of the underlying litigation [about whether this court would recognize a**

The U.S. Tax Court's decision in *Wiggins v. Commissioner*, 92 T.C. 869 (1989) is particularly relevant in this regard and to the facts at issue here.  In that case, the taxpayers recaptured certain investment credits previously granted in their computation of "regular" income tax owed, thereby decreasing the alternative minimum tax owed and their total tax liability.  The year following the filing of the taxpayers' return, Congress passed a statute clarifying that the investment credit was <u>not</u> to be recaptured, and <u>not</u> to be included in taxpayers' regular tax for purposes of computing alternative minimum tax liability.  The tax treatment of these credits was made retroactive to cover the year of the tax return in question, and the Internal Revenue Service sought to recover both the taxes and penalties based in negligence.  After noting that "[p]etitioner bears the burden of proof with respect to the negligence addition," the court explained that "*[t]he additions to tax for negligence will not be applied where the deficiency is due to a mistaken interpretation of the law on*

---

**specific claim] significantly (if not fatally) undermines any claim that the [l]awyers were negligent in failing to bring such a claim.**" This case presents us with the opportunity to make clear that no claim of legal malpractice will be actionable for an attorney's reasoned exercise of informed judgment on an unsettled proposition of law. . . . See <u>Denzer v. Rouse</u>, 48 Wis. 2d 528, 180 N.W.2d 521, 525 (Wis. 1970) ("A successfully asserted claim of legal malpractice needs more than the fact, standing alone, that a trial or appellate court interpreted a document differently than the lawyer or his client presumed they would.  A lawyer would need a crystal ball, along with his library, to be able to guarantee that no judge, anytime, anywhere, would disagree with his judgment or evaluation of a situation."). Whether Finnegan's strategy of challenging only liability in the initial appeal was reasonable requires consideration of the state of the law regarding constitutional challenges to excessive punitive damages at the time of the appeal.

*Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 667-68 (D.C. Circuit 2009) (emphasis added).

*which there can be an honest difference of opinion*," (internal citations omitted, emphasis

added).  The court held that no negligence penalty could apply under these facts:

> After the year in issue, Congress amended section 55(f)(2) to clarify the treatment of investment credit recapture in computing the alternative minimum tax.  Petitioners did not have the benefit of this clarification when they made their return. It was not unreasonable for petitioners to believe that they could include the tax on investment credit recapture in computing their alternative minimum tax liability.

*Wiggins*, 92 T.C. at 873.

In this case, there is significant and indisputable evidence available from the public

record that the scope of the TRB Order and the inclusion of the subject WHAs within it

"was ambiguous by Commerce's own acknowledgment."  *Quiedan Co. v. United States*,

927 F.3d 1328, 1333 (Fed. Cir. 2019).  We noted above that Commerce issued at least two

public statements – one in its letter of June 15, 2010 initiating a formal scope inquiry in

response to New Trend's request, and another in a <u>Federal Register</u> notice concerning New

Torch a month later – explicitly stating that the agency "cannot determine whether . . .

WHAs should be excluded from the scope of the Order" and "has not yet determined

whether WHAs are covered by the scope of the order on TRBs."   Moreover, the

commencement of formal scope inquiries in each of these cases is *prima facie* evidence

that the merchandise in question is not unambiguously within the scope of the order based

upon the plain text of the applicable regulation, 19 CFR §351.225(e) (2010) (stating that

such an inquiry indicates "that the issue of whether a product is included within the scope

of an order or a suspended investigation cannot be determined based solely upon the

application and the descriptions of the merchandise referred to in paragraph (k)(1) of this

section.").

The principle embodied in the tax court holdings summarized above should therefore apply with equal force in this case – there can be no negligence penalty issued against WXA *as a matter of law* given that the inclusion of the subject WHAs within the scope of the TRB Order was not settled at the time the entries were made, and reasonable differences of opinion existed with regard to this issue. The incontrovertible facts here demonstrate that, by its own admission, Commerce *itself* could not determine whether the subject WHAs were within the scope of the TRB order and years of litigation were devoted to resolving this very issue. Prior to the scope litigation, the question was not answered publicly, even preliminarily, until December 6, 2011, when Commerce first published notice of its scope ruling holding that WHAs were within the scope of the TRB Order. Similar to the taxpayers in *Wiggins*, WXA "did not have the benefit of this clarification" when it filed its entries.

Moreover, the decision of WXA to file its entries of the subject WHAs as outside the scope of the TRB Order was objectively *reasonable*. In *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007), the Supreme Court considered whether the appellant's interpretation of its obligations under the statute at issue in that case – the Fair Credit Reporting Act – was "objectively unreasonable" and therefore constituted a violation of the law. Although the Court disagreed with the appellant's reading of the statute – explicitly finding it "erroneous" – it held that the interpretation was not objectively unreasonable because:

1) The statutory text was silent with regard to whether it covered the conduct of the appellant; and

2) There was no guidance from the courts of appeals or the governing agency (the FTC) "that might have warned it away from the view it took."

*Safeco*, 551 U.S. at 69-70.

Application of these factors to WXA's entries of the subject WHAs must yield a similar result.  As explained previously, the text of the TRB Order is *completely silent* with regard to the potential coverage of WHAs within its scope.  At the time the importer filed its entries of the subject WHAs, neither this Court nor the Court of Appeals for the Federal Circuit had spoken on the issue, and no authoritative guidance had yet been issued by Commerce until December 6, 2011.  In fact, a *majority* of domestic market participants responding to ITC questionnaires issued in connection with a sunset review of the TRB Order conducted less than a year after the entries in question were filed reported that

- TRBs and WHAs do not have the same physical characteristics or end uses;

- the manufacturing processes for TRBs and WHAs are not similar; and

- TRBs and WHAs are not interchangeable

*Tapered Roller Bearings from China*, USITC Pub. 4343 at 13-14.  Coupled with the years of litigation in *Power Train* on this very issue, it is abundantly clear that the treatment of WHAs as different products than TRBs, *outside* the scope of the TRB Order, was *reasonable*.

In sum, there can be no negligence with regard to WXA's entries of the subject WHAs filed in this case from June 24, 2011 to November 30, 2011, as the law requiring the company to consider these articles within the scope of the TRB Order was unsettled until at least December 6, 2011 and the conclusion WXA reached with respect to the issue was reasonable.  Therefore, the Government cannot prove its claim of negligence based upon the facts alleged in its complaint *as a matter of law*, and the claim with respect to the alleged negligent failure to declare and deposit antidumping duties under 19 USC §1592(a) must be dismissed.

II.   **THE COMPLAINT FAILS TO STATE A CLAIM THAT WXA VIOLATED 19 USC §1592 WITH RESPECT TO ITS TARIFF CLASSIFICATION OF AUTOMOTIVE PARTS AND ACCESSORIES.**

Between October 1, 2007 and September 30, 2012, WXA imported universal joints and parts thereof (including crosses, cross assemblies, yokes, caps, cups, bearing caps, and bearing kits), WHAs incorporating radial ball and tapered roller bearings, radial ball bearings, tapered roller bearings, and other parts and accessories of automobiles (including axle, cage for double offset joint of constant velocity axle (CV), race for CV axle used in utility vehicle, CV-joint part, tube assembly, and steering shaft for combine) into the United States.  Cmpl. ¶ 8-9.

The Government's complaint alleges that WXA misclassified these articles at the time of entry under the HTSUS.   See Cmpl. ¶¶ 29-50.  None of these paragraphs, however, asserts that WXA misdescribed the subject merchandise on its commercial invoices, omitted relevant factual information regarding the products from those invoices, or submitted any other material misstatement or omission of *fact* regarding these products when filing the entries in question.   Rather, each of the allegations in these paragraphs simply claims that WXA entered the goods under one tariff provision (generally automobile parts under headings 8708 or 8709), but that these articles "are properly classifiable" under a different tariff provision.   *Id*.

It is well-established that a tariff classification is not a "fact" but, rather, a conclusion of law.  *Franklin v. United States*, 289 F.3d 753, 757 (Fed. Cir. 2002).  When there are no material factual disputes as to the imported articles, "*the classification issue collapses entirely into a question of law.*"  *Cummins Incorporated v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006) (emphasis added); *see also Carl Zeiss, Inc. v. United*

*States*, 195 F.3d 1375, 1378 (Fed. Cir. 1999) (classification of undisputed merchandise is entirely a question of law).[17]

Absent any allegations regarding the character, nature or description of the merchandise utilized by WXA at the time of entry – in other words, allegations regarding the *factual* statements made by the importer – the Government's complaint cannot support a claim for either negligence or gross negligence under 19 USC §1592 even if the tariff classifications asserted in the complaint are presumed to be correct. Therefore, the Government's complaint fails to state any *facts* that would entitle it to recover the lost revenue or penalties sought with respect to its tariff classification claims, and those counts of its complaint must be dismissed pursuant to USCIT Rule 12(b)(6) on this basis alone.

Moreover, as detailed further below, the tariff classifications asserted by the Government are *not* actually correct, and those used by WXA at the time of entry were reasonable. Because a bona fide tariff classification dispute cannot alone support penalty liability under 19 USC §1592, the Government's complaint fails to state a claim entitling it to relief on this basis, as well, *even if* the classifications it asserts would ultimately be accepted by this Court.

**A. The Government's complaint does not allege a single misstatement of fact by WXA with regard to the tariff classification of its merchandise, and therefore the complaint does not state a claim for relief under 19 USC §1592.**

As noted above, the Government's complaint alleges that WXA misclassified the articles described therein under the HTSUS at the time of entry, and that these incorrect

---

[17]   In such cases, because there is no factual or evidentiary dispute, the statutory presumption of correctness afforded to certain Customs decisions under 28 USC §2639(a)(1) is *irrelevant*. *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483-84 (Fed. Cir. 1997), *Universal Electronics., Inc. v. United States*, 112 F.3d 488, 492-93 (Fed. Cir. 1997).

classifications resulted in a loss of revenue to the Government.  See Cmpl. ¶¶ 29-50. Furthermore, these incorrect classifications *alone* are alleged to constitute the "false statements and omissions" justifying the assessment of penalties pursuant to 19 USC §1592 in Counts Three through Nine of the complaint.  Cmpl. ¶¶ 63-83.  The complaint contains **_zero_** allegations that WXA (1) misdescribed the subject merchandise on its commercial invoices, (2) omitted relevant factual information regarding the products from those invoices, or (3) submitted any other material misstatements or omissions regarding these products when filing the entries in question, *other* than the use of a tariff classification the Government asserts to be incorrect.

Indeed, it is precisely because the proper tariff classification of merchandise is a question of law that this Court routinely decides tariff classification disputes on the basis of motions for summary judgment.  *See*, *e.g.*, *Cont'l Auto. Sys. v. United States*, 2022 Ct. Intl. Trade LEXIS 94 (Slip Op. 2022-94) (Aug. 12, 2022), *Magid Glove & Safety Mfg. Co. LLC v. United States*, 567 F. Supp. 3d 1334 (Ct. Int'l Trade 2022), *Amcor Flexibles Kreuzlingen AG v. United States*, 560 F. Supp. 3d 1326 (Ct. Int'l Trade 2022), and other similar cases too numerous to list.  Summary judgment under USCIT R. 56(a) is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," and thus these decisions demonstrate that the tariff classification cannot, by definition, represent a *fact* the truth or falsity of which an importer can represent in its entry paperwork or, as here, the Government can allege in a complaint.

The tariff classifications asserted by WXA in the entry paperwork filed in this case, therefore, are not *facts* which, if incorrect, could constitute "false statements and omissions

in violation of 19 USC §1592(a)" as alleged by the Government.  Rather, the Government's

tariff classification claims are legal conclusions couched as factual allegations, which this

Court is not bound to accept as true for purposes of deciding this motion to dismiss.  *See*,

*e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), *Papasan v. Allain*, 478 U.S.

265, 286 (1986), *citing Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Circuit 1981), *aff'd on*

*other grounds*, 460 U.S. 325 (1983) and 2A J. Moore & J. Lucas, Moore's Federal Practice

para. 12.07, p. 12-64, and n. 6 (1985).

   This Court followed this principle (that tariff classifications are not facts, but rather

are conclusions of law) in *Fabrene, Inc. v. United States*, 17 C.I.T. 911 (1993), a case

concerning a challenge to the refusal by Customs to reclassify certain imported products

based upon an alleged "mistake of fact . . . not amounting to an error in the construction of

a law" pursuant to 19 USC §1520(c).[18]  In its complaint, the plaintiff did not allege the

"existence of a material fact either unknown or erroneously relied upon by Customs," or

any facts "stating how the [ ] description of the imported merchandise was inaccurate."

*Fabrene*, 17 C.I.T. at 914.  Rather, the complaint alleged solely that Customs improperly

classified the merchandise under the HTSUS.  Given this limited allegation, the Court held

that the plaintiff had failed to state a claim that would entitle it to relief under 19 USC

§1520 – a statute that, like 19 USC §1592, explicitly required proof of an incorrect fact –

and therefore granted the defendant's motion to dismiss.

   Similarly, courts have regularly dismissed cases in other contexts where the

complaint alleges legal conclusions asserted to be false.  For example, cases involving

perjury often turn upon whether the statements made during sworn testimony are "false,"

---

[18]  This provision of law was repealed in 2004.

and if those statements are legal conclusions – not facts – they cannot support a perjury claim as a matter of law.  *See*, *e.g.*, *Kolaski v. United States*, 362 F.2d 847, 848 (5th Cir. 1966) ("The statute here involved is a perjury statute.  As in the general statute on perjury, 18 USC §1621, the gist of the offense is a false statement, willfully made, of a material matter.  The statement must be with respect to a fact or facts.  *United States v. Debrow*, 346 U.S. 374 (1953).  *See Williams v. United States*, 239 F.2d 748 (5th Cir. 1957).  The statement must be such that the truth or falsity of it is susceptible of proof.  *United States v. Slutzky*, 79 F.2d 504 (3rd Cir. 1935).").  *See also United States v. Endo*, 635 F.2d 321, 323 (4th Cir. 1980) ("At common law and under many state statutes, statements which present legal conclusions are considered opinion, and cannot form the basis of a perjury.") and *In re Disciplinary Proceeding Against Huddleston*, 137 Wash. 2d 560, 571-72, (1999) ("Opinions and legal conclusions are not subject to perjury convictions . . . For purposes of perjury, a false statement must relate to facts and must also be susceptible to proof as to its truth or falsity," *citing Endo*).[19]

A similar analysis mandates dismissal of the Government's tariff classification claims in this case.  As explained above, 19 USC §1484 requires that each entry "shall set forth such *facts* in regard to the importation as the Secretary may require," (emphasis

---

[19]  *Accord Debnam v. FedEx Home Delivery*, No. 10-11025-GAO, 2011 U.S. Dist. LEXIS 35417, at *4 (D. Mass. Mar. 31, 2011) ("The defendant goes on to argue that the plaintiff's misrepresentation and fraud claims likewise fail.  It contends that the sole allegation regarding a misrepresentation is that the Agreement mischaracterizes each driver as an independent contractor, rather than as an employee.  The characterization of the relationship is not a statement of 'fact' but rather an assertion of a legal conclusion.  It is not properly the basis of a claim for factual misstatement.  The claims for fraud and misrepresentation therefore fail.").

added) and thus a violation of 19 USC §1592 requires the Government to prove that the entries in question either set forth false statements of fact, or omitted relevant facts, in regard to the importation. The Government's complaint in this case, however, does *not* allege the existence of material facts regarding the merchandise that were either incorrectly stated or omitted by the importer. Rather, the complaint asserts nothing more than the Government's *legal* conclusion that the merchandise imported by WXA was incorrectly classified.

Like the perjury statutes discussed in the cases above, the "gist" of an offense under 19 USC §1592 is a false statement (*e.g.*, water ski is described as a snow ski or an apple is described as a banana), and that statement must be with respect to a fact or facts the truth or falsity of which are susceptible of *proof*. The Government's complaint in this case makes no allegations of fact with regard to WXA's tariff classifications, but merely asserts its disagreement with those legal conclusions. This complaint, therefore, is insufficient to support a claim under 19 USC §1592 as a matter of law, and the causes of action based upon allegedly incorrect tariff classifications must be dismissed.

Indeed, a review of the tariff provisions declared by WXA demonstrates that there is nothing false about them. While the Government may claim that a different tariff provision is more correct, there is nothing false about the statements or descriptions of the merchandise made on the entries. All of the descriptions are 100% truthful with regard to the imported merchandise. There simply is no false statement, act or omission on the entry paperwork – only reasonable differences in tariff interpretation.

**B. Universal joints, crosses, yokes and other parts of universal joints are, in fact, correctly classified as parts of motor vehicles within HTSUS heading 8708, and thus there is no legal basis for the misclassification claims with respect to this merchandise.**

The complaint alleges, among other things, that "Wanxiang misclassified the universal joints and parts and accessories of universal joints entered under cover of the entries identified on Exhibit A . . ," Cmpl. ¶35, and the purported misclassification of these items alone is the basis of a claimed $3,573,823.39 in lost revenue and $10,926,485.24 in penalties. Cmpl. ¶¶ 39, 40, 68, 71. Based upon well-established tariff classification principles, however, it is clear that the universal joints, crosses, yokes and other parts of universal joints imported by WXA are <u>not</u> properly classified as "parts" of goods of HTSUS heading 8483 (in HTSUS subheading 8483.90.80) as claimed by Customs, and therefore there is no basis for the loss of revenue or penalty asserted by Customs with respect to this merchandise under the law.

The tariff classification of all merchandise imported into the United States is governed by the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation ("ARIs"), which provide a framework for classification under the HTSUS. According to GRI 1, the HTSUS headings, as well as relative section or chapter notes, govern the classification of a product. Thus, when determining the correct classification for merchandise, one must first construe the language of the headings in question, in light of any related section or chapter notes. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998). Moreover, the GRIs are to be considered in numerical order. In other words, as per GRI 1, the headings and relevant notes are to be exhausted before inquiries, such as those required by the relative specificity and essential character rules of GRI 3, are considered. *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed.

45

Cir. 2011).  Only after determining the proper heading does a court look to the subheadings

to decide the correct classification for the merchandise.  *Orlando*, 140 F.3d at 1441 (*citing*

GRI 6).  *See also Faus Group, Inc. v. United States*, 581 F.3d 1369, 1372 (Fed. Cir. 2009).

   In this case, Note 2(e) to HTSUS Section XVII (which contains Chapter 87 and

heading 8708) provides that "the expressions 'parts' and 'parts and accessories' do not

apply to" (among other items) "articles of heading 84.81 or 84.82 or, **provided they**

**constitute integral parts of engines or motors, articles of heading 84.83**."  (emphasis

added).  In similar fashion, Note 1(l) to HTSUS Section XVI states that this section does

not cover "Articles of Section XVII.  Based upon the operation of these section notes,

therefore, an article that is potentially classifiable as a "part" of a motor vehicle that is also

described by heading 8483 *must* be classified in heading 8708 – and not the classification

asserted by the Government in this case – unless the article "constitutes an integral part of

an engine or motor."

   Customs itself has recognized this principle in numerous rulings.  For example, in

NY N198080 (January 13, 2012), the agency considered the tariff classification of "clutch

release bearings" – single row, axial ball bearings for use in an automobile clutch assembly.

The ruling stated that "we find that this particular release bearing is housed and falls within

heading 8483, HTSUS.  However, since the bearing is not an integral part of an engine or

motor and is 'solely or principally' used with motor vehicles of chapter 87, it falls to be

classified in heading 8708, HTSUS."  Similarly, NY F81211 (January 6, 2000) classified

a suspension strut bearing within heading 8708 rather than heading 8483, explaining as

follows:

> There are three relevant legal notes. Section XVI, Note 1(l), HTSUSA,
> excludes articles of Section XVII from classification within Section XVI.

Section XVII, Note 2(e), HTSUSA, states that articles of heading 8483 are excluded from Section XVII if the articles constitute integral parts of engines or motors. Section XVII, Note 3, HTSUSA, requires that the term "parts" in chapter 87 refers only to parts which are used solely or principally with the articles of chapter 87.

You state that the strut component is designed and used exclusively as part of an automobile suspension system. Since the support is used "solely or principally" with motor vehicles and motor vehicles are classified in chapter 87, the strut component is a "part" within the meaning of Section XVII, Note 3. Motor vehicles designed for the transport of persons are classified under heading 8703, HTSUSA. As a part that is solely or principally used with articles of heading 8703 the strut component meets the terms of heading 8708.

Furthermore, Section XVII, Note 2(e) only excludes articles of heading 8483 which are parts of engines or motors, from Section XVII. Since the strut component is used in a vehicle's suspension system and not with engines or motors, it is not excluded from Section XVII by Note 2(e).

The strut component is clearly an article of Section XVII. Articles of Section XVII are excluded from classification within Section XVI under heading 8483 by Section XVI, Note 1(l).

*See also* NY C82026 (January 29, 1998).

The universal joints, crosses, yokes and other parts of universal joints at issue in this case are designed and used exclusively as parts of automobiles – an undisputed fact in this case. Cmpl. ¶ 8. Moreover, they are clearly *not* a part of an engine or a motor. Therefore, based upon the plain language of the relevant section notes and Customs' own precedent cited above, these articles are properly classified as parts of motor vehicles within heading 8708.

Importantly, this Court's decision in *Mitsubishi Elecs. Am. v. United States*, 882 F. Supp. 171 (Ct. Int'l Trade 1995) is not inconsistent with this conclusion. *Mitsubishi* concerned the tariff classification of certain parts of starter motors, noting in a footnote that such articles could not be classified as parts of automobiles because "a subpart of a

47

particular part of an article is more specifically provided for as a part of the part than as a part of the whole." *Mitsubishi*, 882 F. Supp. 171, 175, n.3.  However, parts of a starter motor would "constitute integral parts of engines or motors" and would therefore be excluded from classification under heading 8708 based upon Section XVII Note 2(e) and GRI 1.  To the extent *Mitsubishi* stands for the proposition that a provision covering a "part of a part" is more specific than a provision covering a "part of the whole," such an analysis goes to the relative specificity of two different tariff provisions under GRI 3(a), and would not be relevant in a case such as this where classification may be based solely upon the terms of the relevant section notes under GRI 1.  *See Orlando*, *supra*.

Contrary to the summary classification conclusions in the complaint, therefore, the universal joints, crosses, yokes and other parts of universal joints at issue in this case are properly classified as parts of motor vehicles within heading 8708, and are legally *precluded* by the HTSUS section notes from classification within the provision asserted by the Government, heading 8483.  The Government has not, and cannot, allege any facts in its complaint that could change the result of this legal analysis, which is based solely upon the text of the relevant HTSUS provisions.  The Government has therefore failed to state a claim that may support its claim to relief under 19 USC §1592, and thus the counts based upon the alleged incorrect tariff classification of this merchandise must be dismissed. Moreover, the facial inapplicability of the Government's own asserted tariff provision highlights the *bona fide* nature of the dispute over the classification of this merchandise, the existence of which is fatal to the assertion of a penalty based upon the "misclassification" of the articles in this case.

**C.  WXA did not act with either gross negligence or negligence with regard to the tariff classification of the merchandise in this case.**

Even if the tariff classifications asserted by the Government in its complaint are assumed to be correct, WXA did not act with either negligence or gross negligence under 19 USC §1592 as a matter of law.  Unable to prove a necessary element under the statute, the Government has thus failed to establish a right to the relief requested and its tariff classification claims must be dismissed.

**1.  The Notice of Action issued by Customs concerning the tariff classification of parts of universal joints did not require WXA to enter these articles under HTSUS subheading 8483.90.80.**

The complaint in this case asserts that WXA was negligent with regard to its misclassification of universal joints and parts thereof for entries prior to July 1, 2009, but grossly negligent with regard to the misclassification of such articles after that date.  The basis for the July 1, 2009 cutoff date is a Notice of Action issued by Customs on that date stating its opinion that crosses and steering yokes were to be classified under HTSUS subheading 8483.90.80 and dutiable at the rate of 2.8% *ad valorem*.  Cmpl. ¶ 36.  It is well established, however, that *an importer's failure to follow the decision of a Notice of Action in prospective shipments of the same merchandise is not a sufficient basis for a claim for monetary penalty under 19 USC §1592.*

Importantly, a Notice of Action is a statement from Customs regarding action that the agency plans to take with regard to *prior* entries; it does not establish a legal requirement that an importer must follow for future entries.  In 1987, Customs proposed to amend its regulations to require importers who had received written notice from a Customs official of the tariff classification for an imported article to provide that classification on the CF-7501 for subsequent shipments as stated in the written notice (*See Proposed*

49

*Customs Regulations Amendments Relating to Tariff Designation on Entry Documents*, 52 Fed. Reg. 36279 (September 28, 1987)).  Failure to comply with this requirement was explicitly stated in the proposal to be sufficient basis for a claim for monetary penalty under 19 USC §1592.  The Notice of Proposed Rulemaking defined the term "written notice" to include:

(1)     Customs rulings and decisions on requests for internal advice;
(2)     A protest decision issued pursuant to Part 174 of this chapter;
(3)     **A notice of action (Customs Form 29)**;
(4)     An entry rejection notice; or
(5)     An advice letter.

Emphasis added.

Importantly, however, this proposed rule was never adopted and, consequently, the prior state of the law remained in effect – as it does now.  By Customs' own practice, a Notice of Action does *not* legally require the importer to classify subsequent shipments of a particular article (let alone other articles) in accordance with that notice.  Moreover, the issuance of such a notice does not trigger an obligation on the part of an importer to obtain formal advice regarding the classification of the subject merchandise either through consultation with Customs or by filing a binding ruling request; there is simply no such requirement in either the statute or the regulations.  In sum, WXA was not legally required to classify its subsequent shipments of universal joint parts in accordance with the decision set forth in the Notice of Action dated July 1, 2009, and the issuance of that CF-29 did not trigger any legal requirement for the company to seek clarification of the classification to be used for such products.  As noted above, absent a legal duty to consult with Customs regarding the classification of the universal joint parts in this case, it is well-established that Customs cannot prevail on a claim based upon a breach of such a duty (*i.e.*, gross

negligence or negligence).  *See, e.g., Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 341, 162 N.E. 99 (N.Y. 1928) (Cardozo, J.) ("Proof of negligence in the air . . . will not do.").

**2. The facts alleged in the complaint cannot support a claim of gross negligence under 19 USC §1592.**

To establish a violation of 19 USC §1592, the Government must prove both that an entry occurred through the use of a material false statement (or omission) and that such statement occurred as a result of the alleged violator's culpability.  The complaint in this case alleges in part that WXA acted with gross negligence in misclassifying the subject merchandise.  The facts alleged by the Government in this notice, however, are insufficient to establish this culpability as this term has been defined by Customs and the courts.

The Penalty Guidelines applicable to the administrative resolution of cases under 19 USC §1592 are set forth in 19 CFR Part 171 Appendix B and reproduced in the U.S. Customs Informed Compliance publication entitled "Mitigation Guidelines:  Fines, Penalties, Forfeitures and Liquidated Damages."  In those Guidelines, the term "gross negligence" is defined as follows:

> A violation is deemed to be grossly negligent if it results from an act or acts (of commission or omission) done with actual knowledge of or wanton disregard for the relevant facts and with indifference to or disregard for the offender's obligations under the statute.

Based upon this definition, therefore, gross negligence requires proof of some degree of actual knowledge on the part of the importer, or, at the very least, the ready availability of relevant facts which the importer has chosen to ignore.  *See*, *e.g., United States v. Ford Motor Co.*, 463 F.3d 1286, 1292 (Fed. Cir. 2006) ("[A] determination of gross negligence involves a determination of intent . . . ." (internal citation omitted)).  To

reach a level of culpability of gross negligence in this case, therefore, would require the Government to prove not just that parts of universal joints were actually properly classified within subheading 8483.90.80, but also that WXA actually knew or wantonly disregarded this classification in directing its broker to enter the merchandise under a different provision.

As explained above, however, whether the subject merchandise was "correctly" classified is not a fact at all, but rather a legal conclusion.  Moreover, given the legal arguments supporting classification of these articles under heading 8708, it is very likely that subheading 8483.90.30 is *not* the correct classification of these articles – the issue is one which has not yet been definitively resolved by a court of competent jurisdiction and remains one regarding which reasonable minds may differ.  Thus, based upon the information in the complaint, neither "actual knowledge" nor "wanton disregard" of a relevant *fact* – one of which is required to establish a scienter of gross negligence – can be proven by the Government in this case; the complaint alleges only that the merchandise was misclassified.

**3. The facts alleged in the complaint cannot support a claim of negligence under 19 USC §1592 where, as here, there is a reasonable basis for the classification chosen at the time of entry.**

We noted previously the statutory requirement, pursuant to 19 USC §1484, that an importer make entry using "reasonable care," and the failure to exercise reasonable care could – when coupled with a material false statement or omission made in connection with an entry – establish a violation of 19 USC §1592.  During passage of the Customs Modernization and Informed Compliance Act (the "Mod Act"), Congress provided its view regarding its interpretation of this standard:

The following are two examples of how the reasonable care standard should be interpreted by Customs: (a) the failure to follow a binding ruling is a lack of reasonable care; and (b) *an honest, good faith professional disagreement as to correct classification of a technical matter shall not be lack of reasonable care unless such disagreement has no reasonable basis* (e.g., snow skis are entered as water skis).

*See* H. Rep. No. 103-361 at 120-21, *reprinted in* 1993 U.S.C.C.A.N. 2552, 2670-71 (1993) (emphasis added).

Clearly, then, a *bona fide* disagreement regarding the proper tariff classification of imported merchandise grounded in a reasonable difference in interpretation of the relevant provisions cannot, as a matter of law, support a claim of negligence under 19 USC §1592. Thus, in this case, even assuming *arguendo* that all of the facts concerning the classification of this merchandise set forth in the complaint are true, the Government cannot prove a failure to exercise reasonable care on the part of WXA – all that is alleged is an incorrect classification. Moreover, we explained above that there are persuasive legal arguments supporting the classification of these articles under heading 8708, and that it is very likely that the provision alleged in the complaint – subheading 8483.90.30 – is *not* the correct classification. The classification chosen by WXA, therefore, had a reasonable basis. Under such circumstances there can be no negligence actionable under the statute.

Indeed, because the proper classification of an article is a question of law which reasonable minds may answer differently, Customs and the courts have long recognized that a penalty action is not the proper vehicle for the settlement of a *bona fide* classification dispute. For example, in *United States v. Thirty-One Boxes*, Case no. 16,465a, 28 F.Cas. 56 (S.D.N.Y. 1833), the District Court for the Southern District of New York rejected the government's attempt to obtain forfeiture of certain articles of iron based upon the

importer's alleged misdescription of the articles on the commercial invoice and the filing of the entry in accordance with that invoice.  As noted by the Court,

> Probably it is of constant occurrence at the custom house, that merchants and the collector differ as to the rate of duties to be applied to an entry, when the goods are accurately and exactly denominated.  The court know[s] judicially, that such differences have sometimes occurred, and that the construction the merchants claim for the laws has been upheld in all the courts.  Had it been invariably otherwise, Congress would deal with most ungenerous severity with the citizen, by confiscating his property for a difference of opinion . . . . In my opinion a misdescription of that character would not afford ground for forfeiture of the goods.  28 F.Cas. at 62.

Nearly 150 years after the decision in *Thirty-One Boxes*, Customs noted in T.D. 78-174 (January 11, 1977) that under many circumstances the submission of an invoice with "inconclusive information" may not properly form the basis of a §1592 violation:

> The question . . . depends upon whether those individuals involved in the importation of the merchandise had reasonable cause to believe the truth of the information provided to Customs.  The invoice [in the example] contained "inconclusive information" but not erroneous information.  **If the merchandise may arguably be classified under the cited provision there may be a classification question which should not be the subject of a section 592 violation.**  (emphasis added)

Similarly, the Notice of Proposed Rulemaking published in the <u>Federal Register</u> on September 28, 1987, cited earlier, stated that

> Customs has been reluctant to impose a penalty under 19 USC §1592 if the only material falsity upon entry involves supplying an incorrect tariff designation.

It is important to note that Customs' policy does not require the importer to ultimately prevail on the merits in order to avoid the §1592 violation.  The policy simply recognizes that an importer should not be penalized where the merchandise may arguably be classified under a different tariff provision than the provision claimed to be applicable by Customs.

54

The complaint contains *no* allegations questioning the accuracy of the invoice descriptions or other facts used to support the tariff classification chosen by WXA with respect to the company's importations of universal joints and related parts.  In addition, Customs' own precedents discussing the applicability of heading 8708 instead of heading 8483 demonstrate that the issue is, at the very least, *arguable*.  The Government's complaint, therefore, is insufficient to support its claim under 19 USC §1592 as a matter of law, and the causes of action based upon allegedly incorrect tariff classifications must be dismissed.

## CONCLUSION

We respectfully request that the Court dismiss this action with prejudice.  The facts in the Government's complaint demonstrate that it is engaging in an impermissible retroactive application of law with regard to the TRB antidumping duty order.  At the time of the entries in question, there was no legal obligation for WXA to treat its WHAs as being within the scope of the TRB order.  With regard to the alleged misclassifications, the Government's complaint does not allege any false statement, act or omission (such as a misdescription of the merchandise) – only a disagreement with Plaintiff's legal conclusions as to the classification of its merchandise.  In sum, Plaintiff has failed to state a claim upon which any relief can be granted.

Respectfully submitted,

ROLL & HARRIS LLP
Attorneys for Plaintiff

By: _____

Michael E. Roll
1999 Avenue of the Stars

Suite 1100
Los Angeles, CA 90067
Tel: (310) 294-9501


Brett Ian Harris
2001 L Street NW
Suite 500
Washington, DC  20006
Tel: (845) 255-1850


Dated: October 12, 2022

## **CERTIFICATE OF COMPLIANCE**

I, Michael E. Roll, of Roll & Harris LLP certify that Defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss, dated October 12, 2022, complies with the word count limitation under the Court's chambers procedures, as amended by the Court's order in this case, dated October 5, 2022 (ECF # 10), and contains 16,812 words. In so certifying, I am relying upon the word count feature of the word processing program used to prepare the memorandum.

_____
Michael E. Roll

# EXHIBIT 1

Case 1:21-cv-00205-GSK Document 12-1 Filed 10/12/21 Page 68 of 73
Case 1:11-cv-00153-GWC Document 30-2 Filed 11/26/11 Page 2 of 4
5782



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

Scope Inquiry (~~Tapered Roller Bearings~~) *NEW TREND WHEEL HUB UNITS* A-570-601

## OFFICIAL FILE

PUBLIC DOCUMENT
AD/CVD/O8: KDH



June 15, 2010

### TO ALL INTERESTED PARTIES

Dear Sir or Madam:

The United States Department of Commerce ("the Department") has received a request on behalf of New Trend Engineering Ltd. ("New Trend"), for a clarification as to the scope of the antidumping duty orders on tapered roller bearings ("TRB") from the People's Republic of China ("PRC"). At issue is whether New Trend's wheel hub assemblies are outside the scope of the order. New Trend asserts that their wheel hub assemblies should be considered outside the scope of the antidumping order because wheel hub assemblies are complete automotive units that provide additional functionality beyond a standard tapered roller bearing, and are not tapered roller housing as identified by the TRB scope. For this reason, New Trend has requested that the Department exclude their wheel hub assemblies from the scope of the antidumping duty order.

The Department defined the scope of the order as covering:

> Tapered roller bearings and parts thereof, finished and unfinished, from the PRC; flange, take-up, cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use. These products are currently classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") item numbers 8482.20.00, 8482.91.00.50, 8482.99.15, 8482.99.45, 8483.20.40, 8483.20.80, 8483.30.80, 8483.90.20, 8483.90.30, 8483.90.80, 8708.99.81.15 and 8708.99.81.80. Although the HTSUS item numbers are provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

*See Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China,* 52 FR 22667 (June 15, 1987) ("Order").

The Department finds that it cannot determine whether New Trend's wheel hub assemblies should be excluded from the scope of the Order based solely upon New Trend's application for a scope clarification and the descriptions of the merchandise referred to in 19 CFR 351.225(k)(1). Specifically, the information provided in New Trend's scope request is insufficient to determine whether or not its wheel hub assemblies are considered tapered roller housing. Therefore, in accordance with 19 CFR 351.225(e), the Department is initiating a scope inquiry. The Department hereby requests comments from all interested parties specifically addressing the issue set forth above.

000008



In completing its analysis, the Department will consider any written arguments that interested parties submit within the specified time limits. Where appropriate, comments should include copies of any documents deemed relevant by the submitting party to the scope of the order. **Please note that parties need not reiterate any points previously made in submissions already placed upon the record of this particular proceeding.** Documents that are not presented to the Department, or placed by it on the record, will **not** constitute part of the administrative record attendant to this scope proceeding.

For your comments to be taken into account concerning the scope of the order, we must receive your written submission no later than Monday, July 5, 2010. You will then have until Thursday, July 15, 2010, to submit any written rebuttals to comments submitted by other interested parties. *See* 19 CFR 351.225(f)(iii). All submissions must be made directly to:

> **Secretary of Commerce**
> **Attn: AD/CVD Operations Office 8**
> **APO/Dockets Unit, Room 1870**
> **U.S. Department of Commerce**
> **14th Street and Constitution Avenue, N.W.**
> **Washington, D.C. 20230**

The requirements of sections 351.303(b), (c), (d), (e), (f), and (g) of the Department's regulations apply to the submission of information in this inquiry. The Department will maintain this request and all comments in a public file. The public file will be maintained in the Central Records Unit, Room 1117, 14th Street and Constitution Avenue, NW, Washington, D.C., 20230.

The Department considers the information officially received when stamped by the Central Records Unit with the date and time of receipt. *See* 19 CFR 351.103(b). The cover letter or front page of your submission should clearly indicate that it is submitted in connection with a scope inquiry for tapered roller bearings from the PRC (case number A-570-601), and should include the information specified at 19 CFR 351.303(d)(2).

In a scope inquiry, you are required to submit six copies of any document. If you request that the Secretary treat portions of the document as proprietary information, submit an additional three copies of a public version of the document. *See* 19 CFR 351.303(c)(1) and 351.303(c)(2)(iii).

You should serve a copy of your comments, by first class mail or personal service, to all interested parties on the Department's service list, which is available to the public on the Department's website at http://ia.ita.doc.gov/apo/index.html. Attach a certificate of service to your submission that lists the parties served and, for each, the date and method of service. *See* 19 CFR 351.303(f).

Section 1331 of the Omnibus Trade and Competitiveness Act of 1988 requires that the providers of information and the person submitting it, if different (*e.g.*, your legal representative), certify that they have read the submission and that the information contained in it is accurate and complete to the best of their knowledge. Any submission that does not contain such a certification statement will not be accepted at the time of filing. *See* 19 CFR 351.303(g).

Any party submitting business proprietary information should clearly label the business
proprietary portion of the submission.  *See* 19 CFR 351.303(d) and 19 CFR 351.304.  In
addition, please state in your cover letter whether you consent or object to release of the
proprietary material under administrative protective order.  If you object to disclosure, you must
submit a statement with your reasons for the objection establishing a "clear and compelling need
to withhold certain business proprietary information."  *See* 19 CFR 351.304(b).

If you have any questions, please contact me at (202) 482-1442, or Steven Hampton at (202)
482-0116.

Sincerely,

*for* Erin Begnal
Program Manager, Office 8
Import Administration

# EXHIBIT 2



Back    Print    Close

Public Service List: A-570-601
Tapered Roller Bearings from People's Republic Of China
Scope Inquiry (Comprehensive Service List for Scope Inquiries) ()

This is a comprehensive list of all parties who have participated in any segment of an Antidumping or Countervailing Duty proceeding involving the subject merchandise in accordance with § 351.225(n) of the Commerce Department Regulations (19 C.F.R. Part 351.225(n)(2001)). All parties on this list are entitled to public documents and public versions of proprietary documents concerning a scope inquiry unless the Department issues a limited version of this list in conjunction with a specific scope inquiry. **NOTE: SERVICE BY E-MAIL IS PROHIBITED without the consent of the party being served (See § 351.303(f)(1)(ii)).**

**Approval Date:** 06/15/2010 12:31:39 PM
**Approved by:** Lohre Holter
William A. Fennell, Esq.
Representative of Timken Company ("Timken")
Stewart and Stewart
2100 M Street, NW
Suite 200
Washington, DC 20037
Phone/Fax: 202-785-4185 / 202-466-1286
Email: general@stewartlaw.com

John M. Gurley, Esq.
Representative of Peer Bearing Company, Ltd.. and Changshan and Peer Bearing Company ("PBCD")
Arent Fox LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5339
Phone/Fax: 202-857-6301 / 202-857-6395
Email: gurley@arentfox.com

Adams Lee, Esq.
Representative of Hubei New Torch Science & Technology Co., Ltd.
White and Case LLP
701 13th Street, NW
Washington DC, 20005
Phone/Fax: 202-626-3625 / 202-639-9355
Email: alee@whitecase.com

Herbert C. Shelley, Esq.
Representative of Changshan Peer Bearing Co. ("CPZ/SKF") and Peer Bearing Company ("Peer/SKF")
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Phone/Fax: 202-429-3000 / 202-429-3902
Email: hshelley@steptoe.com

Kevin M. O'Brien, Esq.

7/14/2010 2:46 AM

Representative of Blackstone OTR LLC and OTR Wheel Engineering, Inc. ("OTR")
Baker & McKenzie
815 Connecticut Avenue, NW
Washington, DC 20006-4078
Phone/Fax: 202-452-7000 / 202-452-7074
Email: www.bakernet.com

George W. Thompson, Esq.
Representative of New Trend Engineering Ltd. ("New Trend")
Neville Peterson LLP
1400 16th Street, NW
Suite 350
Washington, DC 20036
Phone/Fax: 202-861-2959 / 202-861-2924; 202-861-6077
Email:


End of Service List

7/14/2010 2:46 AM